PHILLIPS v. MEEKER COOPERATIVE LIGHT & POWER ASS'N (WALLING, Adm'r, Wage and Hour Division, U. S. Department of Labor, Intervener).

RENVILLE–SIBLEY COOPERATIVE POWER ASS'N v. DENTON et al. and Joe Maxwell (WALLING, Adm'r, Wage and Hour Division, U. S. Department of Labor, Intervener).

Nos. 1136, 1148.

District Court, D. Minnesota, Fourth Division.

Nov. 13, 1945.

John A. Goldie and Samuel I. Sigal, both of Minneapolis, Minn., for George P. Phillips.

Patrick J. Casey, of Litchfield, Minn., Lauerman & Pfeiffer, of Olivia, Minn., and Harold Le Vander, of South St. Paul, Minn., for Meeker Cooperative Light & Power Ass'n.

Lauerman & Pfeiffer, of Olivia, Minn., for Renville-Sibley Light & Power Ass'n.

B. D. Grogan, of Mankato, Minn., Alexander Seifert, of Springfield, Minn., and Sidney P. Gislason, of New Ulm, Minn., for both cooperatives.

L. J. Lauerman, of Olivia, Minn., for National Rural Electric Cooperative Ass'n and Minnesota Electric Cooperative.

Douglas B. Maggs, Sol., and Archibald Cox, Associate Sol., both of Washington, D. C., and James M. Miller, Regional Atty., and Robert L. Barrett, Asst. Atty., both of Minneapolis, Minn. (C. Ira Funston, Supervising Atty., of Washington, D. C., of counsel), for United States Department of Labor.

NORDBYE, District Judge.

The Administrator of the Wage and Hour Division, United States Department of Labor, intervened in both of the above-entitled actions. These two cases involve common questions of law and will be considered together. The action noted as Civil No. 1148 seeks relief in behalf of certain employees against their employer for overtime compensation under Section 7 of the Fair Labor Standards Act, 29 U. S.C.A. § 201 et seq. The action noted as Civil No. 1136 was instituted by the Renville-Sibley Cooperative Power Association against two of its employees seeking a declaratory judgment that the Fair Labor Standards Act is inapplicable to it, and seeking to restrain these two em-

ployees from enforcing any right under the Act. These two employee defendants made no appearance at the trial, and, at the suggestion of the parties, the Administrator was considered to be the plaintiff and the Association the defendant, so that the burden of proof rested upon the Administrator in going forward in establishing the right to the relief which he sought in his complaint in intervention; that is, the Administrator in the intervening complaint sought a declaratory judgment that the Association was subject to the Act with respect to the defendants named and the other employees, and sought injunctive relief restraining the Association from violating the provisions of the Act.

In discussing these cases, the Meeker Cooperative Light & Power Association will be referred to as the Meeker Cooperative, and the case involving this cooperative will be referred to as the Meeker case. The Renville-Sibley Cooperative Power Association will be referred to as the Renville-Sibley Cooperative, and the case involving this cooperative will be referred to as the Renville-Sibley case. The following questions are presented in both cases:

1. Are the so-called outside employees of these cooperative companies engaged in the production of goods for commerce within the purview of the Act?

2. Are the office employees of the two cooperative companies engaged in the production of goods for commerce and are they also engaged in commerce within the meaning of the Act?

3. Are the employees of these two co-operatives exempt from the Wage and Hour provisions of the Act under Section 13(a) (1) (2) thereof?

A somewhat extended statement of facts seems necessary as to each cooperative.

*Meeker Cooperative:* This cooperative distributes electricity in six Minnesota counties and covers an area of some 2,400 square miles. It has approximately 960 miles of line and has about 2,300 consumer members. Its customers are varied. They include farmers, creameries, a hatchery, a few hybrid seed-corn processors, some fur farms, the Civil Aeronautics Authority, which supervises the lighting of two air-line beacons, churches, schools, and homes. All of the customers, with the exception of the churches, schools, and homes, use the electricity so distributed for light, heat and power in the regular course of their respective businesses. The parties have stipulated that, with the same exception above noted, the operations of these consumers result in the production of goods produced, raised and processed, a substantial portion of which find their way directly or indirectly into interstate commerce. All of the electricity distributed by this cooperative is purchased from a municipal light plant in the State of Minnesota, and the electricity generated by the municipal plant and that distributed by the cooperative does not cross State boundaries. This cooperative receives its electricity at a voltage of 2,300 and it increases the voltage to 7,200 for distribution. It is stepped down, however, so that the consumer uses a voltage of either 110 or 220. It has 11 employees, 6 of whom are outside employees and 5 of whom are office employees. The outside employees engage in new construction and in maintenance. The maintenance of the line includes all the necessary work to keep the lines in repair so as to insure continuity of service. Generally speaking, about 50% of their time is devoted to construction of new lines and 50% to maintenance. This division, however, may vary each year. The lines are constructed and maintained up to the yard pole and meter on the consumer's premises. Obviously, if the lines are not kept in repair so that there is a cessation in the distribution of electricity, the various consumers affected would have to close down the operations which are dependent on electric current.

The financing of this cooperative has been underwritten by the Rural Electrification Administration with loans totaling $976,000. The first loan was made in June, 1936, for $450,000, and the last loan in September, 1944, for $150,000. At the present time, the indebtedness to the R.E.A. amounts to between $650,000 and $700,-000. The lines which are now operated cost approximately $877,000. It appears that the loans from the R.E.A. which has its offices in St. Louis, Mo., have been arranged by means of loan contracts, mortgages, mortgage notes, and deeds of trust. This financial set-up requires close supervision and control of the operation of the cooperatives by the R.E.A. office in St. Louis. Construction work is either done by a contractor or by the cooperative through its own crews. Since 1942, most

of the construction has been done by the maintenance and construction employees. When a contractor does the work, there must be an approval of the contract by the R.E.A., and also of the contractor and the engineer hired. The payments to the contractor are made available from loan funds allotted to the cooperative by the R.E.A. When construction work is carried on by the cooperative's own employees, an Estimate Construction Work Order, together with other data, is sent by the office employees to the R.E.A. office for approval. Usually the work is not commenced until R.E.A. approval is obtained. During the progress of the work, daily time records are maintained by the men and turned in to the office employees, together with a daily inventory sheet. After the construction is completed, the Final Construction Work Order is prepared, reflecting the information on the time and inventory sheets, and two copies of this document, together with a letter of transmittal, are forwarded to the R.E.A. office at St. Louis for approval. Before funds are advanced by the R.E.A., a requisition must be submitted, and accompanying this requisition order there is required a statement which indicates how the last money advanced by the R.E.A. was expended, and such expenditures must be verified with attached receipts or comparable data. There is also inventory information forwarded at the same time so that a proper balance is reflected. The office procedure referred to above in a general way reflects the steps taken by the office force where the construction work is done by the local crew. It differs slightly when the work is done by a contractor. In addition to these transactions with the R.E.A. office, when new construction is being carried on, monthly reports are made to the R.E.A. office. Typewritten copies of the minutes of the Board of Directors, including the monthly as well as the special meetings of the Board, are also forwarded to the R.E.A. office. It appears from the evidence that at the present time this cooperative has adopted the so-called group purchase plan promulgated by the R.E.A., and in availing itself of this facility, copies of purchase orders are mailed to the R.E.A. office.

The inside employees also take care of the book work, correspondence, billing, sending out of meter cards, the writing and mailing of checks, and such other clerical work as may be necessary for the operation of the business of the cooperative. It may be noted that the bookkeeping system follows a form recommended by the R.E.A. office. A partial analysis of the checks sent out in the years 1942 and 1944 shows that some 474 checks were mailed out, with the total divided about equally in the two years mentioned. Out of this total, some 64 checks were forwarded by mail to points outside of the State. The evidence indicates that since October 24, 1938, there have been 4,582 checks mailed from the office, and of that number 485 checks were sent out of the State. These checks were drawn on the Operation Account. Since that same date, some 250 or 260 checks have been drawn on the Construction Account, and of that number 47 have been sent to points outside the State.

*Renville-Sibley Cooperative:* This cooperative distributes electricity in five Minnesota counties. It has approximately 525 miles of line and 1,013 consumer members. It covers an area of approximately 2,240 square miles. It generates no electricity, and none of its distribution lines cross State lines. The electricity it distributes is purchased from a municipal power plant which generates the electricity; none of its lines cross State boundaries. It receives the electricity at a voltage of 2,300 and increases it to 7,200 volts for distribution. This voltage is stepped down, however, to 220 or 110 for use by consumers. There are two employees in the maintenance and construction crew, and two office employees besides the manager. Since 1938 this cooperative has received loans from the R.E.A. at St. Louis totaling $554,000, the actual allotment, however, being $393,000. At present it owes the R.E.A. approximately $315,000.

The work of the construction and maintenance crews is about the same as related with reference to the Meeker Cooperative. The majority of the construction, however, has been done by contractors. The office work of the employees compares with the work performed by the Meeker Cooperative office employees. Substantially the same routine is followed in forwarding data to the St. Louis office of the R.E.A. Reference may be made, however, to Intervener's Exhibit 2, which reflects the following with reference to the work performed by the office employees since 1938: 66 Estimate Construc-

tion Work Orders with attachments, 168 Final Construction Work Orders, 24 Work Order Schedules, 21 Final Expenditure Reports with 304 assorted attachments, 23 Financial Requirement Statements with 83 assorted attachments, and 208 assorted monthly reports were prepared and sent to the R.E.A. office at St. Louis. Also 487 letters and telegrams were prepared and sent to the R.E.A. at St. Louis or Washington, D. C. In addition, 836 form letters, cards and telegrams were received by this defendant from the R.E.A. office at St. Louis, Missouri, or Washington, D. C. Taking the first six months of 1942 and the last six months of 1944 as representative periods, it appears that some 34 checks were written and sent out of the State, totaling $30,358.13 in amount, and that 267 miscellaneous letters, telegrams, cards, etc., were prepared and sent out to destinations outside of the State, while 2,729 were sent to intrastate points. Some 305 letters, telegrams, etc., were received from out of the State and 2,517 from within the State.

This cooperative distributes electrical current to farmers, a rendering plant, a hybrid seed-corn processor, turkey raisers, homes, churches, and schools, and the parties have stipulated that, except as to the churches, homes, and schools, the consumers use the electricity distributed for light, heat and power in the regular course of business, which results in the production of goods, a substantial portion of which find their way directly or indirectly into interstate commerce. The rendering plant receives all of its electricity from this cooperative and uses the same for light and power in processing of dead animals, butchers' scraps, etc. The products produced are hides, tankage and grease. All of the grease is shipped out of the State. In 1944, the dollar value of the grease was about $125,000. All of the hides produced were shipped out of the State, and their value in 1944 was approximately the same as that of the grease produced. Some of the tankage is also shipped interstate. It is conceded that the plant is wholly dependent on electricity for its operation. Among other uses for electrical power, the following may be enumerated: The hoist for lifting dead animals is operated by electricity; the hides are taken off by electrical power; the cooker is agitated by electricity; and certain grinding and mixing is also carried on by electric pow-

er. The grease obtained is pumped into storage tanks and the pump is operated by electricity. During the years 1943 and 1944, the average monthly consumption of the rendering plant in kilowatt hours was 15.6 per cent of the total average monthly distribution of electricity by this cooperative.

■■■ I. Were the employees of these two cooperatives employed in the maintaining of the power lines engaged in the production of goods for commerce? Manifestly, if these employees were engaged in an occupation necessary to the production of goods for commerce, then the question must be answered in the affirmative. Section 3(j) of the Act provides that "an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State." It may be helpful to consider first whether any of the consumers of these two cooperatives are producers of goods for commerce, and, if so, the relationship which exists between these maintenance employees and such producers. In the Meeker case, among the consumers are four creameries located at Manannah, Rosedale, Forest City, and North Kingston, Minnesota. These four creameries are entirely dependent for their operation on the electrical current furnished by this cooperative. As an example, the creamery located at Manannah uses some seven motors in its operations. Approximately one-half of all the butter produced in this creamery is shipped out of the State. The hatchery which obtains its electrical power from this cooperative operates its incubators and brooders with electrical current. It sells about ten thousand chickens a year and approximately 95 per cent of this number are shipped out of the State. There are about three hybrid seed-corn processors. While the hybrid seed-corn growers use the electricity purchased for general farming operations, they also use electrical power for the shelling and drying of hybrid seed corn. Most of the seed corn is sold locally to dealers who sell it intrastate. However, one of the growers produces and sells about eighty thousand bushels a year, and between one-fourth and one-third of this amount is shipped

directly to purchasers in other States. There are some three fur farms, and they use electrical power in grinding animal food, lighting the buildings and grounds, and pumping the necessary water for the animals. Two of the breeders ship their pelts to other States. The third ships a substantial amount in interstate commerce. Without considering the farmers who raise various types of grains and produce which eventually find their way into interstate commerce, either directly or indirectly, it seems clear that the consumers heretofore referred to are producing goods for interstate commerce. The butter, the seed corn, the chicks, and the fur pelts move out of the State and are therefore subject to the Act. The electrical current supplied by the defendants furnishes the power and the light with which all carry on these operations. If the current is cut off, the operations cease. Without suitable facilities in serviceable condition, such as poles with cross-arms, the wires, transformers, and other electrical devices, electrical current could not get to these consumers, and it seems evident that the maintenance crew are directly responsible for the electrical energy's arriving to the consumer. Their services in repairing and maintaining the lines are not only necessary but indispensable to the continuity of this service. Without them, no consumer would be safe in relying on this power for his operations. Daily in their activities in repairing, maintaining and servicing these lines, they insure the uninterrupted flow of electrical energy to the consumer. Their work, therefore, is directly necessary to the production of goods which the consumer sends directly or indirectly into the channels of commerce. Such relationship is not remote or tenuous, but direct and vital. The causal connection between their work and the production of goods for commerce by the aid of electrical energy is just as direct as that which exists between the engineer who services the steam boiler in a steam plant and the production of goods where steam is the power utilized for that purpose. The fact that these maintenance employees are not engaged in the physical process of producing goods for commerce is not determinative of their rights in view of the plain and unambiguous language of the statute, which embraces all employees whose work is necessary to the production of goods for commerce. The relationship, therefore, between the men who insure the continued flow of electrical energy and the producers of goods who use electrical energy in the production of goods for commerce seems so close and immediate that it must be considered to be the one which is embraced within the intent of Congress when it extended coverage of the Act to these employees necessary to the production of goods for commerce. Generally speaking, the test, of course, is whether the employees' work bears such relationship to the production of goods that it is necessary thereto. When Congress provided that the employees necessary to the production of goods for commerce should be within the Act, it unmistakably indicated that the factual basis is less rigid and narrow for such a relationship than that which would be required in order to justify a finding that an employee was engaged in commerce. Davila v. Porto Rico Ry. Light & Power Co., 1 Cir., 143 F.2d 236. The analogy between the instant situation and the facts which were before the Supreme Court in Kirschbaum Co. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638, and Warren-Bradshaw Co. v. Hall, 317 U.S. 88, 63 S.Ct. 125, 87 L.Ed. 83, amply supports the conclusions indicated herein. It would seem that the activities of the maintenance employees of these cooperatives bear as "close and immediate tie with the process of production for commerce" as the building maintenance workers in Kirschbaum Co. v. Walling, supra, 316 U.S. at page 525, 62 S.Ct. at page 1121, 86 L.Ed. 1638, and the members of the rotary drilling crew of an independent contractor who drilled the oil wells to a depth short of the oil sand stratum in Warren-Bradshaw Co. v. Hall, supra. Granted that it may be difficult to determine with any mathematical certainty the line of demarcation between employees who are too remote from the production of goods for commerce and those who should be considered direct and immediate to such production, so as to be considered necessary within the meaning of the Act, it would seem that, in light of the broad construction given to this remedial legislation by the Supreme Court in the cases just referred to, any question as to the status of these employees under the Act has been set at rest. See, also, Bracey v. Luray, 4 Cir., 138 F.2d 8; Schmidt v. Peoples Telephone Union, 8

Cir., 138 F.2d 13; Reynolds v. Salt River Valley Water Users Assn., 10 Cir., 143 F. 2d 863; New Mexico Public Service Co. v. Engel, 10 Cir., 145 F.2d 636; Walling v. Roland Electrical Co., 4 Cir., 146 F.2d 745.

Although the consumers in the Renville-Sibley case do not embrace any creameries or fur farms, there is one hybrid seed-corn processor and the rendering plant which depend on electrical current furnished by this cooperative for substantially all of their operations. As stated heretofore, a substantial part of the products of the rendering plant is directly shipped into interstate commerce and a substantial part of the electrical energy sold by this cooperative is purchased by this consumer. The causal connection between the work of the maintenance employees for Renville-Sibley Cooperative and the production of goods for commerce by the rendering plant is so direct, immediate and substantial that there can be no serious doubt but that the employees of this defendant who directly make it possible for the plant to operate with electricity are within the Act.

■ But it is urged, particularly with reference to the Meeker case, that the percentage of interstate business of its consumers is relatively so small that the doctrine of de minimus should apply. It points out that the Manannah creamery buys about .23 per cent, the Rosedale creamery .505 per cent, the Forest City creamery .55 per cent, and the North Kingston Creamery Association .33 per cent of the annual sales of this defendant; that the Civil Aeronautics Authority uses approximately one thousand kilowatt hours of electrical energy per month, which is about .052 per cent of the defendant's sale of electrical energy during the month. Further, that the other consumers who produce goods for commerce such as the hybrid seed-corn processors and fur farms use a trifling amount of the total electrical energy sold. As an example, one of the hybrid seed-corn processors uses about .15 per cent of the annual sales of electrical energy per year by this defendant. However, a consideration of the well-reasoned cases clearly indicates that the defendant's position in this regard is not sound. The use of the electrical current by the producers of goods for commerce referred to is not intermittent or sporadic, but regular and continuous. There is no indication in the Act that Congress assumed to make any distinction as to the volume or amount of goods produced by any producer. The test, therefore, is not the amount or volume of goods produced by the consumer for commerce; it is sufficient that the production is constant and consistent. The following cases fully support the views indicated: Schmidt v. Peoples Telephone Union, supra; New Mexico Public Service Co. v. Engel, supra; Sun Publishing Co. v. Walling, 6 Cir., 140 F.2d 445, certiorari denied, 322 U.S. 728, 64 S.Ct. 946, 88 L.Ed. 1564; Strand v. Garden Valley Telephone Co., D.C. Minn., 51 F.Supp. 898; Muldowney v. Seaberg Elev. Co., D.C., 39 F.Supp. 275. Furthermore, attention may be called to the scope of the stipulation in both cases, wherein it is recited that a substantial portion of the goods produced, raised and processed by the consumers other than churches, homes and schools, find their way directly or indirectly into interstate commerce.

■■ II. The recital of facts regarding the work of the office employees in both of these cooperatives should dispel any doubt as to the essential connection between them and the production of goods for commerce. The business of these cooperatives is to furnish electrical current to their consumers. All of these employees are of necessity directing their activities to the successful consummation of that objective—the maintenance employees to keep the lines in such condition that the electrical energy will flow without interruption; the office employees to do the clerical and stenographic work necessary for the conduct of the company's public utility business. The office employees are an integral part of the business of the cooperative. It would seem, therefore, that all of them are necessary to the fulfillment of the cooperative's contract to furnish electrical energy to their consumers and the maintenance of a business organization which continuously supplies the electrical power which produces goods for commerce. Walton v. Southern Package Corp., 320 U.S. 540, 64 S.Ct. 320, 88 L.Ed. 298; Holland v. Amoskeag Machine Co., D.C., 44 F.Supp. 884; Fleming v. Swift & Co., D.C., 41 F. Supp. 825, affirmed 7 Cir., 131 F.2d 249; Fleming v. Atlantic Co., D.C., 40 F.Supp. 654, affirmed 5 Cir., 131 F.2d 518. But, moreover, it must follow that these office employees are themselves engaged in commerce and in producing goods for commerce. The correspondence, reports, and other documents which they prepare,

handle, and forward to the St. Louis office of the R.E.A. constitute commerce. The very nature and character of the supervision which the R.E.A. demands over the expenditures of the funds allotted to these cooperatives requires a continuous and constant flow of articles in commerce. This seems evident from the undisputed facts. Correspondence, reports, fiscal statements, checks and other documents pass to and from the St. Louis office and are "goods produced for commerce." The Act defines goods to mean "goods * * *, wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof." § 3(i). As stated in Fleming v. Jacksonville Paper Co., 5 Cir., 128 F.2d 395, 398: "* * * Those who work either at selling or delivering across State lines, or at buying and receiving across State lines, are employed in commerce, whether they write the letters, keep the books, or load and unload or drive the trucks. * * * And the purchase of goods to be transported across States lines is interstate commerce as truly as the transportation itself. Currin v. Wallace, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441 * * *."

Furthermore, it may be pointed out that these office employees keep the records of purchases made without the State. They handle the correspondence in ordering the goods, receiving invoices, and mailing out the checks in payment thereof. True, their time is also occupied with office work which is intrastate in character, but a substantial amount of their time is occupied with duties pertaining to voluminous correspondence and transmission of documents and records to St. Louis and the clerical work resulting from the purchase of goods without the State. That they are to a substantial extent engaged in commerce seems reasonably free from doubt.

III. Defendants urge that they are local retail or service organizations. They contend that they are merely buying electrical current and selling it, and that that which is sold passes out of existence in this State. They contend, therefore, that the employees come expressly within the language of Section 13(a) (1) (2) of the Act. Section 13(a) provides: "The provisions of Sections 6 and 7 shall not apply with respect to (1) any employee employed in a bona fide executive, administrative, professional, or local retailing capacity, * * *."

Under Section 13(a) (2), the exemption embraces "any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce."

■ It is not necessary to indulge in any extended discussion with reference to the alleged applicability of Section 13(a) (1). Obviously, these employees are not engaged in performing any work incidental to retail sales. These cooperatives are not engaged in making any retail sales of any chattels, and the maintenance and office employees are not engaged in effecting any sales. It seems clear that the relationship of vendor and vendee does not exist between the cooperatives and the consumers. The cooperatives do not pass title to anything. Brown v. Minngas Co., D.C., 51 F.Supp. 363. One must consider the usual concept of an employee engaged in a retail capacity in determining the applicability of the exemption referred to. It would indeed be a strained construction of this section of the Act if it were concluded that maintenance employees or office employees of an electric light company furnishing electrical energy were engaged in a local retailing capacity within the meaning of the Act. In Reynolds v. Salt River Valley Water Users Assn., 10 Cir., 143 F.2d 863, it was held that employees engaged in distributing the water and directing it upon the users' lands were not engaged in making sales. In Title 29, Chapter V, Code of Federal Regulations, Part 541, the Administrator has defined an employee engaged in a local retailing capacity as follows:

"Section 541.4—Local retailing capacity. The term 'employee employed in a bona fide * * * local retailing capacity' in section 13(a) (1) of the act shall mean any employee—

"(A) who customarily and regularly is engaged in

"(1) making retail sales the greater part of which are in intrastate commerce; or

"(2) performing work immediately incidental thereto, such as the wrapping or delivery of packages, and

"(B) whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 per cent of the number of hours worked in the workweek by such nonexempt employees."

These employees do not meet any of the tests as set forth in the Administrator's

definition, nor do they come within the ambit of any usual or commonly accepted interpretation of the language used in the section.

This brings us to Section 13(a) (2). Are the employees engaged in a retail or service establishment, the greater part of whose selling or servicing is in intrastate commerce? At first blush, it might seem reasonable to conclude that a local cooperative company engaged in furnishing electric current to consumers wholly in the State comes within the scope of the exemption. But the history of the Act and the well-considered decisions which have dealt with similar questions seem to have dispelled any doubt as to the scope of the exemption relied upon. These cases are practically unanimous that the retail or service establishment exemption is limited in its application to such establishments as the corner grocery, the drug store, local garage, barber shop, and local service concerns of that character. Schmidt v. Peoples Telephone Union, supra; New Mexico Public Service Co. v. Engel, supra; Reynolds v. Salt River Valley Water Users Ass'n, supra; Walling v. Roland Electrical Co., supra; Bracey v. Luray, supra; Brown v. Minngas Co., supra; Strand v. Garden Valley Telephone Co., supra. As stated in the Schmidt case (page 15 of 138 F.2d): "* * * We do not think that Congress used the term 'service establishment' in its broad sense, which would include public utilities such as railroads, gas and electric companies, telephone and telegraph companies, and the like. In its narrower sense the term applies to an altogether different class of businesses, such as restaurants, hotels, laundries, garages, barber shops, beauty parlors, funeral homes, shoe-shining parlors, clothes pressing clubs, and the like. That the exemption clause to which we are now referring applies to the latter class of businesses is supported by Interpretative Bulletin No. 6, issued by the United States Department of Labor, Wage and Hour Division, in June, 1941, and also by the following: Stucker v. Roselle, D.C.Ky., 37 F.Supp. 864, 867; Fleming v. A. B. Kirschbaum Co., 3 Cir., 124 F.2d 567, 572, affirmed sub nomine Kirschbaum Co. v. Walling, 316 U.S. 517, 526, 62 S.Ct. 1116, 86 L.Ed. 1638; Wood v. Central Sand & Gravel Co., D.C.Tenn., 33 F.Supp. 40, 46; Lorenzetti v. American Trust Co., D.C.Cal., 45 F.Supp. 128, 138.''

In the Garden Valley Telephone Co. case, the following excerpt may be noted (page 903 of 51 F.Supp.): "In its broad sense the term 'service establishment' includes public utilities such as railroads, gas and electric companies, telephone and telegraph companies, and similar organizations. In its narrower sense the term is applicable to a different class of businesses such as hotels, garages, barber shops, laundries, tailor shops and the like. That the exemption clause to which I have just referred applies only to the latter class, or to the term in its narrower sense, is supported by: Stucker v. Roselle, D.C.Ky., 37 F.Supp. 864, 867; Fleming v. A. B. Kirschbaum Co., 3 Cir., 124 F.2d 567, 572, affirmed sub nomine A. B. Kirschbaum Co. v. Walling, 316 U.S. 517, 526, 62 S.Ct. 1116, 86 L.Ed. 1638, and Interpretative Bulletin No. 6 issued by the United States Department of Labor, Wage and Hour Division, in June, 1941. Interpretative Bulletins, such as the one referred to, are by no means binding upon the courts, but I believe they should be given consideration and that they do carry weight."

Moreover, the Administrator's Interpretative Bulletin No. 6 on retail or service establishments lends weight to the contention of the intervener herein that the exemption relied upon is not applicable under the facts herein. Paragraph 29 of that bulletin reads: "Numerous letters have been received from banks; * * * telephone companies; * * * water-supply companies; electric and gas utilities; * * *. Each asserts that it is engaged in rendering service. Although we recognize that the foregoing companies perform service, it is nevertheless our opinion that establishments engaged in such businesses are not in the ordinary case sufficiently similar in character to retail establishments to be considered service establishments within the meaning of section 13(a) (2).''

Also in paragraph 31 the Administrator says: "Many of the foregoing types of business enterprise (e.g., banks, insurance companies, newspapers, utilities, etc.) could have been easily designated for specific exemption and that fact is another reason for our conclusion that such enterprises were not intended to be covered by general language which seems forced and artificial in its application to such cases."

In paragraph 32 the Administrator says: "In addition, it should be noted that the

provisions of certain of the specific exemptions provided in section 13 buttress our opinion in respect of many of the foregoing classes of businesses. * * * Congress designated in section 13(a) (9) certain special classes of utilities for specified exemption. If Congress had intended utilities in general to be considered as service establishments, there would, of course, have been no need for any such exemption. Section 13(a) (11), enacted August 9, 1939, exempted switchboard operators employed in any public telephone exchange which has less than 500 stations. It would be difficult to rationalize the passage of such a special amendment if utilities as a whole were intended to be considered as service establishments."

■ As stated by the Supreme Court in Overnight Motor Co. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682, in commenting on the Administrator's interpretation of the Fair Labor Standards Act (Note 17, 316 U.S. at pages 580, 581, 62 S.Ct. at page 1221): "* * * While the interpretative bulletins are not issued as regulations under statutory authority, they do carry persuasiveness as an expression of the view of those experienced in the administration of the Act and acting with the advice of a staff specializing in its interpretation and application."

■ There is no merit to the suggestion that because under Section 13(a) (6) of the Act employees engaged in agriculture are exempted, and under Section 13(a) (10) of the Act certain processing occupations are exempted, the employees of this cooperative therefore cannot be held to be within the Act because they are merely aiding producers who are themselves exempt from coverage. There is ample evidence to justify the finding that these outside and inside employees are engaged in work necessary to the production of goods for commerce by consumers other than those engaged in farming and processing occupations. But that aside, it would seem that the fact that the exemptions have been granted to farmers and certain processors does not mean that such persons or concerns may not be producers for commerce. On the contrary, the exemption granted by Congress would imply that they would be assumed to be producers for commerce, in certain situations at least, and hence the necessity of an express exemption if they were to be exempted from the requirements of the Act. Moreover, it must follow that none of the defendant employees are "employed in agriculture" and none of them are engaged in handling, etc., agricultural products in "their raw or natural state." Nor were they engaged in the "making" of butter products. Exemptions must be strictly construed, and the nature of the work performed by these employees falls far short of coming within the scope of the exemption referred to. Colbeck v. Dairyland Creamery Co., S.D., 17 N.W.2d 262.

■ Granted that it may be impossible to determine the exact portion of the time which an employee may devote in maintaining and repairing lines exclusively serving a consumer who produces goods for commerce, as distinguished from the maintenance and repair of lines serving, for instance, a school or a church, such fact should not under the circumstances herein militate against the coverage of the maintenance employees under the Act. The light and power system operated by these defendants must be considered as a unit. Although a breakdown of any line transmitting power and light may cripple the activities of a nonproducer for commerce, as well as a producer, the work of the employees in maintaining and repairing the lines necessarily contributes to the continuance of power to all classes of consumers. The maintenance employees must direct their activities, among their other duties, to the general maintenance and repair of the entire system. Under the circumstances, therefore, it seems fair to find that the work of such employees is necessary from day to day to the consumer who produces goods for commerce and to whom substantial damage may result if the power upon which he is dependent is not constant.

Findings of fact and conclusions of law in harmony herewith may be presented upon five days' notice. The question of the amount of overtime, liquidated damages and attorneys' fees may be considered at that time.

An exception is reserved to each defendant.