**WALLING v. NORTHWESTERN–HANNA
FUEL CO.**

Civ. No. 747.

District Court, D. Minnesota,
Third Division.

Oct. 3, 1946.

834

James M. Miller, Regional Atty., and Richard R. Converse, Atty., Wage and Hour Division, Department of Labor, both of Minneapolis, Minn., for plaintiff.

Pierce Butler, Jr., and E. G. Vaughan (of Doherty, Rumble, Butler, Sullivan & Michell), both of St. Paul, Minn., for defendant.

DONOVAN, District Judge.

Plaintiff, as Administrator of the Wage and Hour Division, United States Department of Labor, brought this action to enjoin claimed violations by defendant of the Fair Labor Standards Act of 1938, §§ 15(a) (2) and 15(a) (5), 29 U.S.C.A. §§ 215(a) (2) and 215(a) (5), hereinafter referred to as the Act.

Defendant denies plaintiff's allegation of coverage and affirmatively alleges that the employees embraced in the action are exempt under § 13(a) (2) of said Act, 29 U.S. C.A. § 213(a) (2).

Plaintiff has expressed satisfaction with the statement of facts set forth in defendant's brief, and those facts will be adopted here, except where the Court thinks modifications or additions are needed.

The defendant corporation was organized October 8, 1942, and is the successor to Northwestern Fuel Company and the M. A. Hanna Coal & Dock Company. It is engaged in the wholesale distribution of coal, maintaining docks and facilities at Duluth, Minnesota, Superior and Milwaukee, Wisconsin, Waukegan, Illinois, and Menominee, Michigan. In addition to these activities, defendant maintains and operates retail yards at Duluth, Minneapolis and St. Paul, Minnesota, and Superior, Wisconsin. The retail yard operated in Minneapolis is not involved in this case. Employees at the Duluth and Superior yards, with the exception of the foreman at each place, are now and have been paid in accordance with the Fair Labor Standards Act.

In the City of St. Paul two yards are maintained, one at Snelling and Marshall Avenues, and the other on the Mississippi River at the foot of Childs Road.

The yard located at Snelling and Marshall Avenues, in the City of St. Paul, hereinafter referred to as "Yard 8", has a storage capacity of approximately 20,000 tons of coal. Here there are maintained hoppers, bins, loading and unloading machinery, cranes, equipment for treating coal, garage space and ground storage facilities.

Coal arrives at Yard 8 by rail transportation, principally from the storage docks of the defendant at the head of the Lakes. Some coal comes to the yard by direct rail shipments from the mines.

The coal arriving at Yard 8 is unloaded from the railway cars into hoppers, or to stock piles, with a crane operated by an employee and an assistant. The number of employees at the Yard engaged in the coal operations is approximately fifty. In addition to the two men already referred to, there are from sixteen to eighteen truck drivers, about the same number of general laborers, and a general mechanic. The laborers do general work around the Yard and help load the trucks for delivery. Some of them operate the loading and screening equipment used in loading the trucks, and accompany the drivers on deliveries which require the carrying of the coal. There are two clerical employees at the Yard. The clerical employees make out reports of the arrival of the railway cars at the Yard, keep the inventory, weigh the loads as they go out, and complete the sales ticket. These employees do the dispatching of the trucks.

Operations at the River Dock were commenced May 1, 1944. The coal arriving at this yard comes in by barges operated on the Mississippi river. It is served by three different carriers. One of the carriers handles the unloading of the coal by its own employees. Shipments received from other carriers are unloaded by employees of defendant. At this yard there are three employees, a foreman, a crane operator and one general yard laborer. The foreman at this yard keeps the inventory, completes the delivery tickets, keeps records of the receipts of coal arriving at the dock, and weighs the coal as it goes out for delivery. At this yard there are maintained about

sixteen or eighteen stock piles, and as the coal comes in by barge it is piled according to size and kind. The screening of coal where necessary (because of orders for sized coal) is performed at this yard.

Defendant classifies its customers as Domestic, Dealer and Steam. Domestic sales consist of deliveries of coal to dwelling houses, duplexes, apartment houses and small stores, in lots of less than twenty-five tons, and on adjusted weights. Dealer sales consist of those made to dealers or peddlers for resale by them. Steam sales consist of those made to large apartment buildings, schools, churches and commercial establishments, whose annual consumption may be twenty-five tons or more, and are generally made on unadjusted weights. Dealer and steam sales are of a different kind and size of coal from domestic, and are generally made at a lower price.

The sale of steam coal is a highly competitive business, and defendant employs salesmen to solicit this trade. Prior to 1942, it was the practice of defendant's predecessors to enter into written contracts with steam trade consumers, whereby the customer placed an order for his anticipated required annual tonnage. This practice was abandoned, due to wartime conditions. Defendant's steam trade is mainly comprised of a stable group (approximately 80%) of repeat customers. During its first full fiscal year defendant had 824 active steam accounts, and during the second fiscal year it had 794 such accounts. Many of defendant's steam accounts are engaged in the manufacture and production of goods for commerce.

In its domestic trade, made up of some 7,000 accounts, defendant uses the so-called budget contract in about 40% of such accounts. This contract, said defendant's vice president, is "a device principally designed to cement the relation between a domestic consumer and the Company more closely. * * * permitting him [the customer] to make payments throughout the year, or over an eight months' period if he chose—anywhere from eight to twelve—and then we would deliver his coal as he needed it throughout the season".

The dealer sales are made by defendant to "track dealers", or "peddlers", who would call regularly at defendant's yards for the amount of coal required by them, following which they, in turn, would sell the coal to consumers who might themselves be prospective customers of defendant. Some of these "track dealers" made a regular practice of calling at defendant's River Dock Yard to pick up truckloads of coal.

The State of Minnesota, County of Ramsey and City of St. Paul regularly call for bids on their annual coal requirements, and defendant is usually a successful bidder for a part of this business. Following the acceptance of such bids, formal contracts are entered into. During the first fiscal year, 9.9 per cent of the total tonnage delivered from defendant's Yard 8 and River Dock went to these purchasers. During the second fiscal year, 13.2 per cent of the total tonnage delivered from Yard 8 and River Dock went to said purchasers.

Certain of defendant's customers, listed as schools, churches, hospitals, recreation clubs, etc., do not purchase defendant's coal for profit.

Plaintiff submitted proof to the effect that many of defendant's customers are industrial firms engaged in producing goods for commerce. To a large extent they are commercial concerns regularly contacted by defendant's steam coal salesmen. Some use the coal in their manufacturing processes; others use it to heat their places of business. Steam customers (listed in plaintiff's Exhibit 4) did not receive delivery of their annual supply of coal at one time. Delivery would be spread over the year, as storage space was not available for the annual requirements of many of them. The steam customer, however, took his delivery of coal on unadjusted weights, in lots of three tons or more, to qualify for the steam price.

In estimating its annual requirements, defendant is guided by its record of the previous year's sales, the general market conditions, and the trend on the particular types of coal.

Defendant is also engaged in the business of selling, installing and servicing stokers, pursuant to contract with the Iron Fireman

Manufacturing Company of Cleveland, Ohio. At Yard 8, in the City of St. Paul, the defendant maintains a warehouse where there is received and stored stokers and stoker parts. Prior to the war, defendant purchased stokers by the carload and stored them at Yard 8 and at public warehouses. During the war, upon the inauguration of restrictions on the production and sales of stokers, shipments in carload lots were curtailed, and no full carload of stokers was shipped in. All stoker sales are made from the central office, but the employees, ten to fourteen in number, engaged in installation and repairs of stokers, operate out of Yard 8. All activities relating to the stokers are segregated at this yard and have no connection with the sale of coal.

The employees at Yard 8 and River Dock normally exceed forty hours of work per week throughout the year.

The record narrows the issues to these two questions:

(1) Are defendant and its employees engaged in commerce or in the production of goods for commerce, and, if so,

(2) Are defendant's employees exempt from the Act because "engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce", within the meaning of § 13(a) (2)?

It is my opinion that defendant's operations at Duluth and Superior do not constitute a violation of the Act; hence the discussions herein will be limited to defendant's St. Paul properties, and its stoker business.

■ The instant case is of a type in which the trial court is furnished with an abundance of facts to which must be applied remedial legislation liberally construed. No slide rule or formula of mathematical certainty is made available to the trier of the facts in such a case as this. The criterion here is the Act, which was designed "to extend the frontiers of social progress" by "insuring to all our able-bodied working men and women a fair day's pay for a fair day's work". A. H. Phillips, Inc. v. Walling, 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095, 157 A.L.R. 876;

Kirschbaum v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638.

■ Plaintiff has the burden of proof in establishing an affirmative answer to the question of whether or not defendant and its employees are engaged in commerce or in the production of goods for commerce.

The intrastate and interstate features of defendant's business and its employees' work were and are so closely associated as to make difficult the separation of these important features. At times, employees would load their trucks with coal as it was being unloaded from barges or railroad cars that had just come to rest in journeys from states other than Minnesota, or would load their trucks for delivery to the consumer with coal deposited on stock piles or in bins but a short time previously from barges or cars moving in interstate commerce.

The record establishes that defendant in a general way knew in advance what its needs would be, whether for retail or wholesale purposes, and ordered its stock accordingly.

■ Does the temporary break in the interstate transportation following arrival of the products we are here concerned with at Yard 8 and River Dock in St. Paul remove the employees from engaging in commerce or in the production of goods for commerce, within the meaning of the Act? The fact that the coal and stokers coming from without the state were temporarily stored in yards or warehouses, as disclosed by the record, is not, in my opinion, sufficient to remove the work of the employees and the goods they were handling from commerce, within the meaning of the Act. Walling v. Mutual Wholesale Food & Supply Co., 8 Cir., 141 F.2d 331; Republic Pictures Corporation v. Kappler, 8 Cir., 151 F.2d 543; West Kentucky Coal Co. v. Walling, 6 Cir., 153 F.2d 582; Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460; Brown v. Minngas Co., D.C., 51 F. Supp. 363; Keen v. Mid-Continent Petroleum Corporation, D.C., 63 F.Supp. 120.

■■ In the case at bar, the employees' contact with and participation in interstate commerce were substantial enough to bring them within the coverage of the Act.

Fleming v. Jacksonville Paper Co., 5 Cir., 128 F.2d 395. The record also discloses that some of the coal is delivered to consumers who are engaged in the production of goods for commerce. The term "production of goods for commerce" in the Act is comprehensive, and includes every incidental operation preparatory to putting goods into the stream of commerce. Walling v. Friend et al., 8 Cir., 156 F.2d 429. That the amount of such goods destined for commerce may be great or small seems of little consequence, as Congress does not indicate that such distinction should be made. As said by Judge Nordbye in Phillips v. Meeker Co-operative Light & Power Ass'n, D.C., 63 F.Supp. 733 at page 740: "The test, therefore, is not the amount or volume of goods produced by the consumer for commerce; it is sufficient that the production is constant and consistent". See also United States v. Darby, 312 U.S. 100, at page 123, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430; Mabee v. White Plains Publishing Co., 327 U.S. 178, 66 S.Ct. 511.

The character of the employees' activities in the case at bar is such as to bring them within § 7(a) of the Act.

Coming now to the second issue, are defendant's employees exempt from the Act because "engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce", within the meaning of § 13(a) (2)?

In the brief of able counsel for defendant this question is aptly worded, "the fundamental controversy in this case". It is, and it is a close and difficult one. The "dependable touchstone" described in Kirschbaum v. Walling, supra, is illusive and absent.

■■ Combating the claim of plaintiff that the employees in question are covered by the Act and not excluded from its benefits, defendant is confronted with two problems, i.e.: (a) the burden of proving the exemption claimed, and (b) the Act, being remedial, must be given a liberal construction, and the section granting exemptions construed strictly against those claiming them. A. H. Phillips, Inc. v. Walling, supra; Helena Glendale Ferry Co. v. Walling, 8 Cir., 132 F.2d 616.

Section 7(a) of the Fair Labor Standards Act provides in part as follows:

"No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce— * * *

"(3) for a workweek longer than forty hours after the expiration of the second year from such date, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

The exemption under Section 13(a) (2) provides in part as follows: "The provisions of sections 6 and 7 shall not apply with respect to * * * (2) any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce."

Is the exemption contained in § 13(a) (2) applicable here? In A. H. Phillips, Inc. v. Walling, supra, at page 493, of 324 U.S., at page 808 of 65 S.Ct., the Court directs that "Any exemption from such humanitarian and remedial legislation [Fair Labor Standards Act] must therefore be narrowly construed, giving due regard to the plain meaning of statutory language and the intent of Congress. To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretive process and to frustrate the announced will of the people."

Defendant contends that, admitting coverage for the sake of argument, it is nevertheless exempt by reason of § 13(a) (2), 29 U.S.C.A. § 213(a) (2), exempting employees engaged in any "retail or service establishment the greater part of whose selling or servicing is in intrastate commerce". Defendant vigorously urges that the selling of coal to the ultimate consumer has been traditionally understood by the coal industry to be a retail business; that the Solid Fuels Administrator defined a retailer to be one selling coal to customers in less than carload lots; that under the Bituminous Coal Act, 15 U.S.C.A. § 828 et seq., the line of demarcation is a "railroad carload", and that less than a carload sale

is retail; that the Secretary of Labor recognized a retail establishment to be similar to that here contended for by defendant; that the definition of "retail" used in the coal industry existed for years prior to the enactment of the Fair Labor Standards Act; and (quoting from defendant's brief) that "It is fair to assume that Congress by the words 'retail establishment' as applied to the coal business, meant the same thing that it meant when it enacted the first Bituminous Coal Act [49 Stat. 991], the second Bituminous Coal Act [15 U.S.C.A. § 828 et seq.], and what the Commission charged with the administration of the latter had said the words meant in the coal business."

There is logic in counsel's argument in the foregoing respect, but the decisions that are controlling in the case at bar oppose the interpretation contended for. Walling v. Consumers Co., 7 Cir., 149 F.2d 626; West Kentucky Coal Co. v. Walling, supra.

Roland Electrical Co. v. Walling, 326 U.S. 657, 66 S.Ct. 413, outlines the course that must be adhered to in the present case in determining whether defendant's business comes within the exemption of § 13(a) (2) of the Act. Mr. Justice Burton, speaking for the Court, said (326 U.S. page 675, 66 S.Ct. 421):

"The word 'retail' because of its ready contrast with 'wholesale' is generally more restrictive than the word 'service'. The two, however, are used so closely together in this statute as to require them to be interpreted similarly. This makes it appropriate to restrict the broader meaning of 'service' to a meaning comparable to that given the narrower term 'retail'. The words are put on a like level especially by their use in the alternative with the single word 'establishment' in the phrase 'any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce.' Accordingly, in proportion as the meaning of the word 'retail' is restricted to sales made in small quantities to ultimate consumers to meet personal rather than commercial and industrial uses of those articles, so it is correspondingly appropriate to restrict the word 'service' to services to ultimate users of them for per-

sonal rather than commercial purposes. This is supported by judicial interpretation of the clause.

"The administrative interpretation by the Administrator of the Wage and Hour Division of the terms 'retail and service establishments', 'retail sales' and 'services' as used in this connection reinforces the interpretations above stated, and this Court in speaking of interpretations of this Act by the Wage and Hour Division, has said: 'In any case such interpretations are entitled to great weight'. United States v. American Trucking Ass'ns, 310 U.S. 534, 549, 60 S.Ct. 1059, 1067, 84 L.Ed. 1345. See also, Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124. * * *

"Although in this case the motors sold by the petitioner were not purchased by its customers for resale or to be processed for resale, and although they were to be used and probably ultimately to be 'consumed' in the hands of the petitioner's customers, these motors remained actively in use in the production of the 'flow of goods in commerce.' It is to this great field of the production of goods for interstate commerce that the Act is directed."

True, the facts of the Roland case were more favorable to plaintiff than are the facts in the present case, but the administrative interpretations here applicable were relied upon by the Court as a basis for the result reached. The Court in the Roland case gives great weight to the Administrator's Interpretive Bulletin No. 6, introduced in evidence in the instant case as plaintiff's Exhibit 61, wherein the Administrator declares that if more than 25% of defendant's gross receipts are derived from non-retail sales, defendant's establishment will be considered non-retail.

A substantial amount of coal and stokers was sold by defendant to customers who must be held to be engaged "in the production of goods for [interstate] commerce". It appears to the Court that defendant's non-retail coal and stoker business is in excess of the 25% tolerance established by the Administrator, and the exemption cannot be extended to defendant's employees. Brown v. Minngas Co., supra, 51 F.Supp. page 371.

Accordingly, defendant "cannot be classified as a 'retail or service establishment' within the meaning of § 13(a) (2) which contemplates an establishment serving ultimate consumers beyond the end of such 'flow of goods in commerce.'" Martino v. Michigan Window Cleaning Co., 327 U.S. 173, 66 S.Ct. 379, 381.

An injunction may issue, limited in scope to defendant's Yard 8, River Dock, and its stoker operations.

Plaintiff may submit findings of fact, conclusions of law and order for judgment consistent with the views herein set forth.

An exception is allowed to each party.