UNITED STATES of America, Plaintiff,

v.

Arnold Ray **HEIGHTLAND**, et al., Defendants.

Crim. Nos. 87–12, 87–12–S.

United States District Court,
E.D. Kentucky,
Pikeville Division.

Dec. 17, 1987.

**160**

Thomas L. Self, Trial Atty., William C. Brown, Asst. Trial Atty., U.S. Attys. Office, Lexington, Ky., for plaintiff.

Garis L. Pruitt, Richard Hughes, Pruitt & Mussetter, Catlettsburg, Ky., for Arnold Heightland.

Edwin J. Walbourn, III, Ashland, Ky., for Donnie Thornsbury.

Miller Kent Carter, Pikeville, Ky., for David Thornsbury.

George C. Howell, Ashland, Ky., for James D. Smith.

WILHOIT, District Judge.

This matter is before the Court upon defendants' motion for acquittal of Counts 1, 2, 3, and 4 pursuant to Crim.R. 29. Counsel made this motion orally at the conclusion of the government's case and was overruled in open court prior to the opening of the defendants' case. The legal issue at hand is whether an *intrastate* carrier, hauling coal for an *interstate* shipper, will come within the protection of 18 U.S.C. § 33. Thorough and extensive research reveals only that our literature is devoid of any precedent.

### FACTS

On May 29, 1985, the four defendants in this action allegedly fired many shots at two coal trucks owned by Phillip West.[1] As a result of this shooting, one driver, Hayes West, was killed and the other driver was wounded. In counts 2 and 3, the defendants are charged under 18 U.S.C. § 33, of having willfully, with intent to endanger the safety of a person on board, damaged and disabled a motor vehicle. In count 1, the defendants are charged pursuant to 18 U.S.C. § 371 with conspiracy to violate 18 U.S.C. § 33 and in count 4 they are charged with using and carrying a firearm in relation to 18 U.S.C. § 33, a crime of violence under 18 U.S.C. § 16.[2]

At issue is the requirement found in 18 U.S.C. § 33, of damage to a "motor vehicle which is used, operated, or employed in interstate or foreign commerce". The two coal trucks were owned by Phillip West, an independent contractor, who had been employed by MHC, Inc. ("MHC") and Samoyed Energy Company ("Samoyed") to haul coal from a mine owned by MHC to a coal preparation plant. The coal mine and preparation plant are located in a remote, mountainous area of Eastern Kentucky near Canada, Kentucky in Pike County. It is undisputed that the trucks hauled *intrastate* only. It is also undisputed that coal hauled by the West trucks was sold *interstate* and that MHC did not sell any coal within the state of Kentucky at the time of the shooting.[3]

The underlying labor dispute was quite typical of the area. The Sharondale Corporation was the previous owner of the mining operations. It had a union shop and employed many area residents. MHC purchased the assets of Sharondale and engaged Samoyed to operate the mine. Great tribulations commenced when MHC/Samoyed brought in non-union employees from other areas to do the mining in the Canada area. Picketing was conducted at the mine and the preparation plant by various union members including some of the defendants in this action. It is alleged that prior to May 29, 1985, blackguarding, rock throwing, gunshots and other acts of violence were committed by both the picketing union members and the security guards employed by MHC/Samoyed.

The picketing proved to be largely ineffective. The non-union trucks continued to

1. Two additional defendants were charged in the indictment. One defendant plead guilty to count 2 prior to trial and another defendant, who allegedly fired the shotgun that killed Hayes West, is to be tried separately.

2. The defendant Arnold Heightland is additionally charged in count 5 of receiving a firearm in interstate commerce while being a convicted felon. *See* 18 U.S.C. § 922(h)(1).

3. Some testimony has indicated that the trucks may have been hauling "gob", a waste product that is left after the coal is processed at the preparation plant, and not coal at the time of the shooting. "Gob" is not transported or sold interstate. This issue of course is a question of fact to be decided by the jury.

roll. The government offered testimony that the defendants set about to escalate the violence from rocks and sling shots to high-powered rifles and shotguns. The stated purpose of this increased fire power was to "stop the trucks." On May 29, 1987, the defendants (or someone) attacked the West trucks from ambush positions on a hillside, with a hail of bullets. Hayes West was fatally wounded by a shotgun pellet that pierced his aorta.

## DISCUSSION

The defendants argue that the facts presented in this case cannot support a finding that the coal trucks were "motor vehicles" which were "used, operated, or employed in interstate or foreign commerce" at the time of the shooting. *See* 18 U.S.C. § 33. As grounds for their motion, the defendants rely upon Supreme Court decisions which limit the application of interstate commerce in related statutes. *See Russell v. United States*, 471 U.S. 858, 105 S.Ct. 2455, 85 L.Ed.2d 829 (1985); *United States v. American Building Maintenance Industries*, 422 U.S. 271, 95 S.Ct. 2150, 45 L.Ed.2d 177 (1975).

In *American Building*, the Court narrowly construed the phrase "engaged in commerce" in the Clayton Act, 15 U.S.C. § 18, and found that the statute created limited federal jurisdiction. *American Building* at 279–80, 95 S.Ct. at 2155–56. The Court reasoned that if Congress had intended to extend federal jurisdiction to the full reach of its commerce power, it would have used the phrase "affecting commerce" in the 1950 amendments. Similarly, the inclusion of "affecting commerce" in 18 U.S.C. § 844(i) caused the Court to extend federal jurisdiction to the bombing of an apartment building. *See Russell* at 862, 105 S.Ct. at 2457–58; *see also United States v. Metzger*, 778 F.2d 1195 (6th Cir.1985). The Court used the legislative history of the statute to find that the language "any building ... used ... in any activity affecting interstate or foreign commerce" applied to a stationary apartment building. 18 U.S.C. § 844(i). Consequently, the defendants assert that the absence of the language "affecting

commerce" in the 1956 adoption of 18 U.S.C. § 33 indicates that Congress intended to create limited federal jurisdiction.

Further, defendants argue that in the parallel statute of 18 U.S.C. § 32 the words "used, operated, or employed in interstate or foreign commerce" were found to apply to the shooting of an aircraft used for crop dusting. *See United States v. Hume*, 453 F.2d 339 (5th Cir.1971). Although the owner and operator of the airplane lived in Texas and the plane was shot while crop dusting in Texas, the plane was found to be "operating" in interstate commerce because the plane had been used to dust three fields in New Mexico on the same day it was attacked. Likewise, in the case at bar the defendants claim that the focus of the interstate commerce should be on the movement of the truck itself and not on any cargo hauled by the trucks. Since the coal trucks did not themselves move out-of-state, the defendants assert that no interstate commerce connection can be shown.

However, the government asserts that the focus of the interstate commerce should be on the cargo carried by the trucks because of the amendment to the statutory definition of "motor vehicles" in 1984. *See* 18 U.S.C. § 31. Prior to this amendment, the legislative history indicated that Congress did not intend for 18 U.S.C. § 33 to apply to "commercial motor vehicles, used primarily for the transportation of property". 1956 U.S.Code Congressional and Administrative News 3151.

In 1984, Congress amended the statute to apply to motor vehicles used for commercial purposes in the transportation of "property or cargo". *See* 18 U.S.C. § 31 (amendment effective on October 12, 1984). Moreover, in the legislative history of the amendment Congress explained that the former statute did not apply to

the shooting at a truck and damaging it with intent to hurt or kill the driver, an occasional occurrence during certain labor disputes and at other times. The Committee believes there is a Federal interest in vindicating these offenses which often take place in remote areas

where State law enforcement may not be effective.

1984 U.S.Code Congressional and Administrative News 3182, 3500.

As a result of the amendment, the government states that Congress has shown an intent to focus upon the "property or cargo" moved in interstate commerce including any shooting at a truck during a labor dispute. The undisputed movement of the coal transported in the West trucks to out-of-state destinations creates federal jurisdiction under the government's interpretation of the statute. The government states that the shooting was directed against the shipment of coal by MHC/Samoyed and was not an act of "personal vengeance" against the trucks. The strikers intended to stop the production of coal by MHC/Samoyed and its resulting employment of non-union employees.

In addition, the government analogizes 18 U.S.C. § 33 to the interpretation of interstate commerce given to 18 U.S.C. § 659, the theft of interstate shipments. *See United States v. Wills*, 593 F.2d 285 (7th Cir.1979); *United States v. Astolas*, 487 F.2d 275 (2d Cir.1973); *United States v. Parent*, 484 F.2d 726 (7th Cir.1973); *United States v. Sherman*, 171 F.2d 619 (2d Cir.1948). Section 659 applies to the theft of "any goods or chattels moving as or which are a part of or which constitute an interstate or foreign shipment of freight, express, or other property". 18 U.S.C. § 659. Under this statute, "[i]t is unnecessary that the goods in question leave the shipper's facility or be actually moving in interstate commerce at the time of the theft." *Wills* at 286. In *Wills*, the statute applied to the theft of a parcel from the United Parcel Service even though the package itself was not moved by the shipping company out of the loading facility. As soon as the package was placed on a conveyor belt, it began its interstate journey and had entered the stream of commerce. *Id.* at 287. Similarly, the government asserts that any coal mined by MHC/Samoyed began its journey in the stream of commerce at the time it was moved out of the mine.

## CONCLUSION

All the cases cited by the parties are not particularly persuasive because they do not deal with or interpret 18 U.S.C. § 33, especially when considered in the light of the 1984 amendment. As a result, the Court must examine the legislative history of the statute and interpret the intent of Congress as consistently as possible with the case law interpretation of other related statutes.

The interpretation given to the extent of federal jurisdiction under a particular statute depends upon the statutory purposes behind the statute. For example, the black lung statute was established to provide benefits to workers who are exposed to coal dust as a result of their employment. *See* 30 U.S.C. § 902(d); *Eplion v. Director*, 794 F.2d 935, 937 (4th Cir.1986). At least one case has defined the placing of coal in the "stream of commerce" as an appropriate dividing line for establishing who can receive benefits under the statute. *Collins v. Director*, 795 F.2d 368, 372 (4th Cir. 1986). Individuals who come in contact with the coal before it reaches the tipple were found to be within the class protected by the black lung statute. For purposes of the black lung statute, coal does not enter the stream of commerce until it leaves the tipple. *Id.*

On the other hand, for purposes of the Fair Labor Standards Act, coal was considered as being "in commerce" even though it was temporarily stored in warehouses and involved an "intrastate" activity. *See* 29 U.S.C. § 215(a); *Walling v. Northwestern–Hanna Fuel Co.*, 67 F.Supp. 833, 836 (D.Minn.1946). "The intrastate and interstate features of the defendant's business and its employees' work were and are so closely associated as to make difficult the separation of these important features." *Walling* at 836. Here, the words "in commerce" were liberally construed in light of the statutory purpose of "insuring to all our able-bodied working men and women a fair day's pay for a fair day's work." *Id.*

The Court could continue with these statutory comparisons ad infinitum. However, in these comparisons and the comparisons made by the government and the defendants, one principle predominates; the statute is construed in relation to its statutory purposes. In the absence of case law interpretation of 18 U.S.C. § 33, the only guidance that can be provided is the legislative history. Further, because commercial trucks were not included in the 1956 adoption of the statute, only the legislative history of the 1984 amendment is relevant. *See* 1956 U.S.Code Congressional and Administrative News 3151. The legislative history of the amendment reveals at least three reasons for applying the statute to "motor vehicles" transporting "property or cargo":

1. Interest of Congress in labor disputes

2. Interest in interstate commerce

3. Interest in "vindicating these offenses which often take place in remote areas where State law enforcement may not be effective."

1984 U.S.Code Congressional and Administrative News 3500.

All three of these interests have application to the incident involved in this action. First, this act of violence took place during a labor dispute. In fact, currently pending before this Court is a RICO claim and counterclaim between the union and MHC/Samoyed seeking treble damages for various acts of violence.[4] Second, the company against whom the violence is directed is an *interstate* seller of coal. All the coal that was transported by the West trucks was shipped by MHC to out-of-state destinations. Third, this incident took place in a remote area of Eastern Kentucky far-removed from any urban center. A Pike County deputy sheriff, who testified for the government, stated that the sheriff's office had tried to remain "neutral" in the strike and investigation of the shooting. (Testimony of Deputy Sheriff Harold Thacker).

**4.** *MHC, Inc. v. United Mine Workers,* No. 85–296, United States District Court, Eastern District of

In light of the legislative history, it is clear that Congress intended for 18 U.S.C. § 33 to apply to the facts of this case. The fact that the trucks themselves may have been engaged in *intrastate* travel does not alter the fact that the coal hauled by the trucks entered the stream of *interstate* commerce. The statutory purposes of this statute can best be effectuated by analogizing 18 U.S.C. § 33 to the interpretation given to 18 U.S.C. § 659. *See United States v. Wills,* 593 F.2d 285 (7th Cir.1979); *United States v. Astolas,* 487 F.2d 275 (2d Cir.1973); *United States v. Parent,* 484 F.2d 726 (7th Cir.1973); *United States v. Sherman,* 171 F.2d 619 (2d Cir.1948). As soon as any coal that is to be shipped out-of-state is placed in a commercial truck, it has entered the stream of commerce. Any willful damage done to such a truck with the intent to endanger the safety of a person on board creates federal jurisdiction over the individual who committed the act.

This Court does not believe that Congress intended to make any meaningful distinction between *interstate* coal hauled by an *intrastate* carrier and *interstate* coal hauled by an *interstate* carrier. Both types of carriers are present around mining operations and are exposed to the same type of dangers from a labor dispute.

The Court therefore concludes, by hauling coal for MHC/Samoyed, an *interstate* shipper, the trucks owned by Phillip West were being "used, operated, or employed in interstate or foreign commerce," notwithstanding the fact that the trucks were hauling *intrastate* only.

Kentucky, Pikeville Division.