**HOLLAND, Adm'r of Wage and Hour Division, U. S. Department of Labor, v. AMOSKEAG MACH. CO.**

Civil No. 160.

District Court, D. New Hampshire.

May 4, 1942.

Vernon C. Stoneman, Regional Atty., of Washington, D. C., for the Government.

Kenneth E. Graf, of McLane, Davis & Carleton, all of Manchester, N. H., for Amoskeag Mch. Co.

MORRIS, District Judge.

This action is brought under Section 17 of the Fair Labor Standards Act of 1938 (Act of June 25, 1938, c. 676, 52 Stat. 1060, U.S.C.A. Title 29, § 201 et seq.), to enjoin violations of Sections 7, 15(a) (1) and 15 (a) (2) of the Act.

The complaint was filed September 26, 1941, and alleges that the defendant has had and now has in its employ a number of employees who are subject to the provisions of the Act and had employed such employees for workweeks in excess of the statutory maximum and has failed to pay the said employees the overtime compensation required by the Act. The complaint further alleges that the defendant has shipped in interstate commerce goods in the production of which employees of the defendant were employed in excess of the statutory maximum without receiving the requisite overtime compensation. The complaint alleges that all the violations referred to were repeatedly committed by the defendant.

The defendant's answer filed October 17, 1941, is a general denial of the applicability of the Act to its employees and a further denial of any violations of the provisions of the Act.

On February 12, 1942, an amended answer was filed admitting the constitutionality of the Act and the jurisdiction of this court but alleges that the application of the said Act is limited to certain of the defendant company's employees at certain times who do certain types of work.

The defendant is a New Hampshire corporation with its place of business in Manchester, New Hampshire. It employes about 160 persons.

When the business of the Amoskeag Manufacturing Corporation was wound up in the bankruptcy court, a corporation known as the Amoskeag Industries, Inc., was organized to take over the property. The properties so purchased were located in what is known as the "Amoskeag Yard." The Amoskeag Yard is approximately a mile and a quarter long, from 600 to 700 feet wide on the east side of the Merrimack River, and from 700 to 800 feet wide on the west side of the river. By its original purchase, Amoskeag Industries, Inc., obtained approximately 8,000,000 square feet of floor space, and acquired ownership of the railroad tracks running the length of the yard. It sold or leased a number of its mills and factories to various manufacturers and producers that are engaged in the production of goods for interstate commerce.

The defendant, Amoskeag Machine Company, purchased the premises now occupied by it from the Amoskeag Industries, Inc. It is a large industry divided into a number of different departments carrying on the business of a machine shop, installing machinery and equipment, replacing worn out and defective parts on machines and doing a general repair work for companies and manufacturers producing goods for interstate commerce. It also does a general repair and construction work for persons and corporations outside those leased or sold by the Amoskeag Industries, Inc. It is not a manufacturing corporation in the ordinary sense of the word, engaged in manufacturing articles for transportation in interstate commerce, but is essentially engaged in repair and construction work within the State of New Hampshire. On two occasions the defendant did work outside the State of New Hampshire, in Lowell, Mass., where they dismantled factory machinery which was removed and set up in Manchester and they installed machinery in a factory in Lawrence, Mass. During the work on the Lawrence job the defendant complied with the provisions of the Wage and Hour Act. This was not true with respect to the Lowell job.

The defendant's business is divided into various departments, including millright, carpenter, machinists, plumbing and sheet metal, piping, electrical, painting, watching and boiler house operation. The defendant supplied watchmen to comply with insurance regulations in its own and other factories and furnished necessary labor for the operation of the two boiler rooms owned by the Amoskeag Industries, Inc. The steam produced in said boiler rooms was sold by Amoskeag Industries, to various manufacturers and producers in New Hampshire engaged in the production of goods for commerce and also for heating their various and respective factories and in the processing and manufacturing of their products.

During the period covered by this action, defendant's average gross annual receipts amounted to $285,000.

An attempt was made to ascertain the income derived from each of the different departments and one witness gave estimates, without having in mind actual figures. The estimates were given in percentages of the entire business. I feel that they were so unreliable as to have little weight.

The defendant maintains an accounting department from which it can be determined each employee's weekly wage, the number of hours of work and the character of the work in which each was engaged.

During the particular period in question, nearly all the watching that was done on the property was done by virtue of an arrangement between Amoskeag Industries, Inc., and Amoskeag Machine Company, with one or two exceptions, whether the premises were leased or whether they were vacant; that during that time there came a period when Amoskeag Industries asked the Amoskeag Machine Company to bill the tenant direct for the service, rather than have it come through two sets of books; that in those instances wherein the tenant did not pay, Industries was obligated to pay the Amoskeag Machine Company. The watchmen were all employed by the Amoskeag Machine Company.

Without going into further details, the foregoing is fairly illustrative of the defendant's business.

Defendant's amended answer contains much material which need not have been alleged but which I find from the evidence supporting the same correctly states the facts.

The Fair Labor Standards Act became effective October 24, 1938. The amended answer alleges that within one year of the operative date of the Act the defendant sought the opinion of counsel on the question of the applicability of the said act to its business and was advised that the character and type of its business, being more than ninety five percent intra-state, did not make it subject to the provisions of the Act. In January, 1941, an examiner for the Wage and Hour Division examined the books and records of the defendant company and thereafter various conferences were had between the representatives of the Wage and Hour Division and the defendant company for the purpose of considering the different questions created by the peculiar type of business of the defendant. No satisfactory result was reached.

It is alleged that on March 29, 1941, the defendant company started to pay all one hundred and sixty of its employees in accordance with the provisions of the Act except for about thirty employees eighteen of whom were working as night watchmen, the others acting as laborers in the boiler house. I find this to be a fact. The night watchmen were paid in accordance with the terms of the Act from May 10, 1941, to the present time.

The defendant alleges that it has been in full compliance with the Act from August 16, 1941, on and that this fact was well known to the petitioner.

The fact that the defendant has been in compliance with the provisions of the Act since August 16, 1941, was urged as grounds for refusing an injunction.

The primary question is whether the duties performed by defendant's maintenance employees are necessary to the production of goods by these factories for interstate commerce so as to bring them within the scope of the Act.

Section 3(j) of the Act defines "produced" as: "* * * produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this Act [chapter] an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State."

It must be conceded that the Amoskeag Machine Company is not engaged in the

manufacture of any goods which are shipped in interstate commerce. Its maintenance employees do not handle goods which are so shipped. Its maintenance men are largely engaged in repairing machinery which is used in the manufacture of goods shipped in interstate commerce. The only part of Section 3(j) of the Act which can be held to include maintenance employees is the last part of the section which reads: "or in any process or occupation necessary to the production thereof."

The language last above quoted, which seems all inclusive, was substituted in the last provisions of the Act for language less inclusive in its earlier draft.

■ The work of defendant's maintenance men is necessary and important in keeping in repair machinery used in the production of goods for commerce and come within the language of the Act as interpreted by the Administrator. While there is no contractual relation between the defendant and the corporation for which it does repair work, the work of its employees embraces all branches of the service.

■ It cannot be denied that defendant's maintenance men, plumbers, electricians, and others worked on machinery which was engaged in the manufacture of goods for interstate commerce. The watchmen and boiler men are in a class by themselves. However, I hold that men who are employed as watchmen in factories manufacturing goods for commerce are essential and so closely connected with the manufacturing end of the business as to come within the purview of the Act. The boiler men are still more closely connected with the manufacturing because the steam produced in these boiler rooms is sold to factories and used both for heating and in connection with the actual manufacture and production of goods for commerce.

I find that the men who service the boilers are entitled to the benefits of the Act.

The thought that impels me to rule as above is that the work performed by defendant's employees on machinery actively engaged in the manufacture of goods for commerce is so essential that if not performed by defendant the corporation would have to employ similar workmen to perform the same labor and if such were the case, employees so engaged would without question be entitled to the benefits of the Act. No reason appears to me why the fact that the work is performed by an independent company should deprive its employees of the benefits of the Act which would be accorded to them if employed by the manufacturing corporation.

■ There are, however, limitations to the applicability of the Act to defendant's business, as its employees do work other than that performed for corporations engaged in interstate commerce. When its men are so employed they are not entitled to the benefits of the Act. However, if any of its employees are engaged a portion of a week for corporations engaged in interstate commerce and the remainder of the week in work outside, I hold that such employee is entitled to the benefits of the Act for the full week.

■ There is one other class of defendant's employees requiring notice and this is the clerical department, which consisted of a head office man and six or seven other employees. The clerks who were paid on a weekly basis received time and a half, those paid on a monthly basis did not receive overtime pay. Clifford Andrews was the head bookkeeper. He worked fifty hours a week and received pay on a monthly basis. He was treated as an executive but the evidence fails to disclose that he falls within that class. I find that all the clerical department, including Mr. Andrews, come under the provisions of the Act.

I find that there were many and long continued violations of the Act. The defendant was violating the Act with reference to its maintenance employees who were engaged in connection with industries manufacturing goods for commerce from its effective date, October 24, 1938, to March 29, 1941; it was violating the Act with reference to its watchmen, whenever such watchmen performed service for corporations engaged in interstate commerce down to May 10, 1941; it was violating the Act with reference to its boiler men down to August 16, 1941; there were minor violations with reference to its clerical employees down to the time of filing of the petition, September 27, 1941.

The defendant vigorously opposes the granting of an injunction because it says violations ceased before this petition was filed. Numerous cases have been brought to my attention where injunctions have been denied because violations had ceased before suit was instituted. Fleming v. Phipps, D.C., 35 F.Supp. 627; Fleming v. National Bank of Commerce, D.C., 41 F.Supp. 833; Jacobs

888

v. Cincinnati Union Terminal Co., Inc.,[1] D. C.S.D.Ohio 1940 (unreported).

■ I am not unmindful of the fact that the purpose of an injunction is to deter a defendant from engaging in the prohibited acts and not to punish him for past conduct. It is a familiar rule of equity that an injunction will not be issued where the wrong complained of has been fully and definitely terminated before the institution of the suit and where there is no likelihood of repetition.

Other cases have been called to my attention where injunctions have been granted even though violations had apparently ceased before the action was brought. United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007; Federal Trade Comm. v. Goodyear Tire & Rubber Co., 304 U.S. 257, 58 S.Ct. 863, 82 L.Ed. 1326; Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; Fleming v. Cincinnati Union Terminal Co., 6 Cir., 117 F.2d 1012.

■ The government's petition for injunctive relief was filed September 27, 1941. The defendant's answer filed October 17, 1941, denied the applicability of the Act to its business; that it was not manufacturing goods for shipment in interstate commerce and that the Court has no jurisdiction in the case.

In its amended answer filed February 11, 1942, the defendant changed its position admitting the jurisdiction of the Court and says: "That it does not contend that the 'Fair Labor Standards Act of 1938' is unconstitutional, nor that it has no application to any of the defendant's employees, nor that the Court lacks jurisdiction in the matter, but says that the application of the said Act, if any, is limited to certain of the defendant's employees at certain times who do certain types of work."

From the pleadings it is obvious that the defendant was not willingly and wholeheartedly in compliance with the Act when the petition was filed.

I cannot say that defendant was so far in compliance with the object and spirit of the Act as to obviate the necessity of some action on the part of the Administrator in order to secure future compliance.

As was said in the case of Bowie v. Gonzalez, 1 Cir., 117 F.2d 11, 16; "The scheme of the statute is broad and comprehensive with the obvious purpose of including all employees in interstate commerce except those specifically excepted. * * * Being a remedial statute, the appellants must bring themselves within both the letter and spirit of the exceptions since they are subject to a strict construction."

After giving due consideration to the nature of the statute and its purpose and having considered all the evidence in the case, defendant's motion to dismiss is denied.

I hold that the petitioner is entitled to an injunction under Section 17 of the Act.

[1] No opinion for publication.