James P. MITCHELL, Secretary of the United States Department of Labor, Plaintiff

v.

TELEPHONE ANSWERING SERVICE, INC., Defendant.

Civ. No. 331–57.

United States District Court
D. Puerto Rico.

Oct. 22, 1959.

Kenneth P. Montgomery and Jose E. Bosch-Roque, San Juan, P. R., and Stuart Rothman, Sol., and John J. Babe, Asst. Sol. of Labor, Washington, D. C., for plaintiff.

Robert E. Schneider, Jr., (Cordova & Gonzalez) San Juan, P. R., for defendant.

DELEHANT, District Judge (Retired, serving by assignment).

Invoking the jurisdiction of this court under Title 29 U.S.C.A. § 217, plaintiff in his official capacity, seeks in this action to obtain a judgment or decree permanently enjoining and restraining the defendant, its agents, servants, employees and attorneys, and all persons acting or claiming to act in its behalf and interest from violating the provisions of section 15(a) (2) of the Fair Labor Standards Act of 1938, as amended (Title 29 U.S. C.A. § 201 et seq., especially section 215 (a) (2). See also Title 29 U.S.C.A. §§ 206 and 207).

Its complaint contains, and is based upon, allegations that defendant, a Puerto Rico corporation, is and at all material times was, engaged at a designated place of business in Santurce, Puerto Rico, in rendering continuous telephone answering service to its subscribers; in which it employs approximately five employees as operators engaged in receiving, relaying and handling for its subscribers

telephone communications in interstate commerce; that in such operations it repeatedly has been and is violating the provisions of Title 29 U.S.C. §§ 206 and 215(a) (2) by paying wages at less than the minimum rates prescribed by such Act, and the designated pertinent wage order issued thereunder, and of Title 29 U.S.C. §§ 207 and 215(a) (2) by employing certain of its employees in interstate commerce for weeks longer than forty hours without compensating such employees for such weekly employment in excess of forty hours at rates not less than one and one-half times the regular hourly rates at which they were employed.[1]

By way of answer, defendant denies that it has at any time violated any of the cited sections of the statute; denies the jurisdiction of the court under Title 29 U.S.C. § 217; denies each and all allegations of the complaint charging it with any such violation; and denies that it, or any of its employees is or are, or has or have been, engaged or employed in interstate commerce; and affirmatively alleges that "the switchboard operators now or at any time heretofore employed by it in connection with its business are expressly exempted from the provisions of the Act." It may be observed that in that final defensive averment it does not specify the section or sections, or language, of the statute upon which it relies for its exemption.

Ordinarily, the court, in an announcement of this character, would reflect the averments of the pleadings in detail and with particularity greater than the foregoing. But in the present instance such particularity appears to be quite unnecessary and would probably constitute mere ostentation. Counsel for the parties have, by successive stipulations, agreed in writing upon the elemental facts touching the corporate and industrial character of the defendant, the nature, manner and extent of its business operations, and its relationship to, and the number of, its employees, including the duties and manner of working of those of its employees who are within the classification of "switchboard operators." The court proceeds now to the exact reflection of those stipulations. Let it be understood that, in such reflection, and because counsel have carefully selected the language of the several stipulations, the court adopts and finds to be true each fact set out in each such stipulation. Both such stipulations were made and entered into in anticipation of trial on the merits of the action, and with a view to the elimination of unnecessary proof therein.

Omitting caption and signature, the earlier stipulation, executed and filed on May 20, 1958, is in the following language:

"Stipulation

"For the purpose of the trial of this case, plaintiff and defendant, through their respective attorneys, hereby stipulate that the following facts are true and may be received by the Court in evidence, subject, however, to the right of either party to introduce further and additional evidence, but not in contradiction of any fact herein stipulated.

"I

"The plaintiff herein is the Secretary of the United States Department of Labor and brings this action for injunction pursuant to authority conferred upon him by the Fair Labor Standards Act of 1930, as amended.

"II

"The defendant, Telephone Answering Service, Inc., is a corporation organized and existing by virtue of the laws of the Commonwealth of Puerto Rico. It has its place of business at 1057 Ponce de Leon Avenue, Santurce, Puerto Rico, where it is

---

1. In apparent inadvertence, the complaint in its paragraph VI omits the word "not" immediately before the words, "less than one and one-half times the regular rates at which they were employed." Despite the omission, the thrust of the allegation there made is clear in its context.

engaged in rendering continuous telephone answering service to less than 250 subscribers.

### "III

"The defendant, Telephone Answering Service, Inc., employs five switchboard operators and a janitor in its place of business in Santurce, Puerto Rico.

### "IV

"The services rendered by the defendant, Telephone Answering Service, Inc., consist of answering any telephone calls to and receiving, telephone messages or communications for its subscribers during time specified by the subscriber. By arrangement, which defendant has made with the Porto Rico Telephone Company, an extension from the subscribers telephone is connected to one of the two switchboards operated by defendant. Any call to the subscribers telephone during the specified hours is answered by an operator employed by defendant for the subscriber, who takes any message the caller wishes to leave, gives the caller whatever information the subscriber has instructed defendant to give, and later reports all calls and messages to the subscriber.

### "V

"The defendant, Telephone Answering Service, Inc., renders its services to approximately one hundred and four (104) subscribers. Among the subscribers served are three (3) airlines, namely: Delta Airlines, Caribbean Atlantic Airlines, and Iberia Spanish Airlines. Each airline provides flights and services between Puerto Rico and places outside of Puerto Rico. For each of these the following services are performed: At the close of each day's operation, the airline's office furnishes the defendant flight numbers, destination of flights, time of departures and arrivals and number of seats available for the next day's flights. When calls are thereafter received by Telephone Answering Service, the switchboard operators give information to the callers on such matters as flight schedules, flight numbers, destination of flights, time of departure and arrivals and number of seats available for the next day's flights on behalf of the airline. The operators give information to individual inquirers and to travel bureaus. All information received by the operators is later reported to the airlines. The defendant's switchboard operators thus enable the three airlines to provide continuous telephone answering service to the public outside the normal work day.

### "VI

"The defendant, Telephone Answering Service, Inc., renders service to commission merchants, manufacturers' representative, wholesalers, insurance companies and law and accounting firms. The services rendered such firms in certain cases also includes the receiving of overseas cables the contents of which are read over the telephone by the cable companies and include also calls from airlines, steamship companies, and trucking firms regarding incoming or outgoing merchandise. Attached to this stipulation as Exhibit A are representative samples of messages delivered by defendant to its subscribers.

### "VII

"Defendant's operators also answer the subscribers' telephones in the case of calls originating from points outside Puerto Rico. The switchboard operators do not talk directly to, take messages from, or give information to persons placing calls from overseas. In the case of station to station calls defendant's operators may talk with the exchange operators where the calls originate but never with the overseas callers. Later the fact that

overseas calls are pending is reported to the subscribers.

"In the representative month of August 1957, defendant's operators answered a total of 14 such cases of calls which originated from outside Puerto Rico. This represents 0.32% of all calls answered in August 1957. Exhibit B which is attached to this stipulation and is a part hereof indicates what these calls were and what reports thereon were made to subscribers.

## "VIII

"An analysis of the business of the defendant for the month of August 1957, which may be described as a typical month of operation, showed that a total of 4,437 calls to the different subscribers were answered by the defendant's switchboards. A breakdown of said total disclosed that defendant's operators answered 136 calls to the airlines, 1,081 to commission merchants, manufacturers representatives and wholesalers; 117 to insurance companies, agents and adjusters; 239 to certified public accountants. The remaining 3,103 calls were to miscellaneous subscribers including lawyers, doctors, dentists, government agencies, engineers and publicity agencies.

## "IX

"The employees employed by the defendant as switchboard operators at the time of the filing of the complaint in this action were paid at rates which ranged from 65 cents to 92 cents an hour. As of the date of this stipulation they are paid from 85 cents to 92 cents an hour. Employees of defendant sometimes work in excess of 40 hours in a week and for the hours in excess of 40 they are compensated at one and one-half times the hourly rates paid them for the first 40 hours.

## "Exhibit A

"The following are samples of messages received by the defendant and delivered to some of its subscribers:

"(1) On August 1, 1957 the following message was received and delivered by the defendant to Julio Roman a commission merchant and importer of fruits and vegetables: 'Mr. Santana from Waterman Dock Co., Pier 11, to tell you to go and pick up 5 bags of potatoes.'

"On August 20, 1957 the following message was received and delivered to the same concern: 'Mr. Figueroa from Waterman Dock Co. called to inform you that the refrigerated goods are coming out.'

"(2) On August 15 and 21, 1957 the following messages were received and relayed to Angel Mayoral a commission merchant and importer of fruits and vegetables. 'Miss Nater (English Cable) message for you.' 'Order placed by Mr. Bernardo Rosado, Ponce, Puerto Rico, on Friday 16th was not cancelled by him. Please cable in order that he may receive shipment next week. If any inconvenience, please phone.'

"(3) The following messages were received and relayed by defendant to Evangelist and Valdez, manufacturers' representative: On August 18, 1957—'Cable for Mr. Evangelist— Skarsdale, New York, reimburse balance to East Brandsten, have them remit 1,000 dollars to me at once with no delay—Mac.'

"On August 21, 1957: 'Message at All America Cable.'

"On August 8, 1957: 'Call operator 41 at 08 for a New York call.'

"August 8, 1957—'Call for Mr. Valdez from Mr. Oppenheimer, Standard Chemical Co., New York.'

"(4) The following messages were received and relayed by defendant to Emilio Rola, commission merchant and Lumber Mills representative: August 29, 1957—'Message at cable Ingles.'

"August 26, 1957—'Message at cable Ingles.'

"August 9, 1957—All America Cable: 'Received check from E. B. Walker, invoice not included.'

"(5) The following message was received and relayed by defendant to Robert Whitton, manufacturers' representative on August 16, 1957: 'Mr. Viera from Eastern Airlines to inform you that the merchandise arrived.'

"(6) The following messages were received and relayed by defendant to Iberia Spanish Airlines. August 29, 1957 'Mr. Gonzalez, Mayaguez, Tel–1630 V—10:00 A.M. flight for Venezuela—inquired about reservations.'

"August 29, 1957—'Miss Caballero, Trans-Globe Tickets Juan B. Melendez flight 982 Madrid 9–18–57–cancelled.'

"August 29, 1957—'Elba Bravo de Alcaide—requesting reservations for September 21 tourist flight Madrid.'

"August 24, 1957—'Miss Ethel Verne, Tel.–6–4886, requesting a reservation in the same flight with Maria Verne.

"August 25, 1957—from Mr. Moliner, Iberia—'Plane arrived in Madrid at 9:27 P.M.—4:27 A.M. Puerto Rico Time.

"August 21, 1957—'Mr. Frank Haugh from Condado Hotel has reservations for Caracas and wants information.'

"August 18, 1957: 'Mr. Camacho from R.C.A. to inform that there is a cable for Iberia.'

"August 13, 1957—'Mrs. Estevez from Tristani Travel Bureau wants two seats, Idlewild-Madrid, Flight 952, 9–4–57–Tourist class.'

"August 8, 1957—'Call for Mr. Moliner from Ciudad Trujillo contact 08 (overseas operator).'

"(7) The following were received and relayed to Caribbean Atlantic Airways—August 22, 1957—'Miss Lydia Betancourt wants reservations for flight 312, St. Croix.'

"August 21, 1957—'Mr. & Mrs. Staler want information for flight 304, St. Thomas.'

"August 15, 1957—'Mrs. Beauchamp cancelling reservation to Ciudad Trujillo.'

"August 12, 1957—'Mr. Urrutia of Eastern Airlines to make reservations for Mr. & Mrs. Katz, flight 306, St. Thomas, 10:30 A.M.'

"August 7, 1957—'Frank Amador, information about four seats for St. Thomas.'

"August 3, 1957—'Reservation for Mrs. Vianca Jackson for St. Thomas.'

"(8) On August 15, 1957 the defendant received and relayed the following message to Dr. Firpi one of the subscribers of defendant. 'Call for Mrs. Firpi from Mr. Samberg of Bogota, Colombia, call operator 41.' "

"Exhibit B

"The following calls originating from points outside Puerto Rico were received and relayed by the defendant in the manner described in paragraph VII of this stipulation of which this exhibit is a part.

"(1) On August 15, 1957 the following message was relayed by the defendant to Dr. Firpi, one of its subscribers 'Call for Mrs. Firpi from Mr. Samberg of Bogota, Colombia. Call operator 41.'

"(2) On August 9, 10, 20, and 23, 1957 the following messages were relayed by defendant to one Capt. Dye, one of its subscribers: 'Call overseas operator 41. They are calling you from Miami (Miss Page).' 'Mr. Heich from Miami, call cancelled.' 'Call from Miss Lockhart, St. Thomas, pending.' 'Call from St. Thomas.'

"(3) On August 8, 1957 the following messages were relayed by defendant to Mr. Valdez of Evangelist

& Valdez, a subscriber: 'Call operator 41 of 08 for a New York call.' 'Call for Mr. Valdez from Oppenheimer, Standard Chemical Co., New York.'

"(4) On August 3, 1957 the following message was relayed by defendant to Iberia Spanish Airline, a subscriber of defendant: 'Call for Mr. Moliner from Ciudad Trujillo, Dominican Republic. Contact 08— overseas operator.'

"(5) The following messages were relayed to a subscriber of defendant named Lehr. On August 5, 12, 21 and 26, 1957: 'Mr. Smith from New York. Call operator 41, San Juan.' 'Call from New York. Ask operator 41, San Juan.' 'Call for Norma Barinco from Brazil.'

" 'Overseas call, operator 41, Puerto Rico Telephone Co.' "

"(6) On August 2 and 13, 1957 the following messages were relayed by defendant to one Menendez, a subscriber of defendant. 'Overseas call, operator 08 will call at your residence.' 'Mr. Seabergner from Houston, Texas. Call operator 41, San Juan.' "

At the inception of the trial, the following further stipulation, executed on August 11, 1958, was presented and, under date of August 12, 1958, filed:

"The parties hereby stipulate, for the purposes of the trial of this action, that the following facts are true and may be received by the court in evidence.

"1.—That the defendant, Telephone Answering Service, Inc., has since its inception and at all times mentioned in the complaint paid and does pay a quarterly license tax to the Municipality of San Juan, based on the volume of its business, and that, for the purpose of said tax, the business of the defendant is classified as the sale of services, group A.

Photostatic copies of said licenses for the quarterly periods of July–Sept. 1956, Oct.–Dec. 1956, Jan.–March, 1957, April–June 1957, July–Sept. 1957, and Jan–March 1958 and an exact translation of said licenses applicable to any of the quarterly periods are attached hereto.

"2.—That the classification of group A, sale of services, is in accordance with the classification created by Ordinance Number 85, 1952–53 series, which classification supplements those classifications that appear in Law No. 26 of March 28, 1914 (21 L.P.R.A. 622) as authorized by Law No. 99 of May 15, 1931 (21 L.P.R.A. 421). A photostatic copy of said ordinance and a translation thereof are attached hereto. ·

"3.—That none of the services performed by the defendant, Telephone Answering Service, Inc., are for resale."

Photostatic copies of all of the instruments or documents mentioned in paragraphs 1 and 2 of the immediately foregoing stipulation are attached hereto and made a part hereof in like manner as if they were set out serially and substantially at this point herein.*

Beyond the foregoing facts set out in the stipulations, the court, upon the basis of those facts themselves, insofar as they disclose the nature and character of the business and work of the defendant and its employees, and also upon the basis of the oral testimony which was offered briefly upon the issue of the alleged statutory exemption of the defendant's employees from the provisions of Title 29 U.S.C.A. §§ 206 and 207, further finds:

1. That within the meaning and intendment of the Fair Labor Standards Act of 1936 as amended (Title 29 U.S.C.A. § 201 et seq.) the defendant, as an employer, is, and those of his employees classified as "operators", and each of

---

* The original opinion included copies of the material here referred to, but the photographic reproductions of such copies furnished to the publisher were too indistinct for copying here.

them, as employees are, engaged in commerce. To the extent that this finding reflects a conclusion resting upon the facts set out in the stipulations, it is further advanced and discussed herein as a part of the announcement of legal conclusions.

2. The business in which defendant was and is engaged is not, and has not at any time been, a "retail or service establishment" within the intent and meaning of Title 29 U.S.C.A. § 213(a) (2). Discussion will also be offered touching this finding which is both factual and legal.

3. The transactions of the "establishment" operated by the defendant are not, by the greater probative weight of the evidence upon the issue, shown to be, or to have been, "recognized" as retail sales or services in the particular "industry." Discussion will also be tendered upon this point.

The court further finds that the defendant has paid, and is paying, to its employees within the classification of operators, wages at less than the minimum rate made applicable to defendant and its employees by the wage order for the construction, *Business Service*, Motion Picture, and Miscellaneous Industries in Puerto Rico as promulgated by the Administrator of the Wage and Hour Division, United States Department of Labor, Title 29 C.F.R., Chapter V, Part 672.

While, as agreed in the concluding sentence, supra, of the stipulation of May 20, 1958, employees of defendant sometimes work in excess of forty hours in a week, and for the hours in excess of forty are compensated at the rate of one and one-half times the hourly rates paid them for the first forty hours, such payment is, and has been, inadequate to comply with the provisions of Title 29 U.S.C.A. § 207, in the respect, and to the extent, that the basic hourly wage itself failed to comply with the provisions of Title 29 U.S.C.A. § 206, but not otherwise.

The court at this transitional juncture recognizes, as it has already suggested, that some of the "facts" whose finding has just been announced are both facts, strictly so called although to some extent factual conclusions, and also conclusions legally rooted in basic or primary facts. They will now be considered in the course of the court's brief announcement of its legal conclusions.

Jurisdiction unquestionably exists in this court. Title 29 U.S.C.A. § 217. The cited statute explicitly confers it. That jurisdiction extends to the right to try the issues made by the pleadings, to find the facts, to grant injunctive relief if the facts so warrant, and if not, to dismiss the proceeding.

■ To entitle him to injunctive relief under the Act, the plaintiff must prove by a preponderance of the evidence (a) that of the employees of the defendant some, at least, were and are engaged in commerce, or (in a case which involves the issue) engaged in the production of goods for commerce;[2] (b) that the violation or violations charged have actually occurred; and (c) that to prevent further violation injunctive relief is reasonably required. Mitchell v. Hertzke, 10 Cir., 234 F.2d 183; Mitchell v. Bowers, D.C.S.C., 157 F.Supp. 344, 345; Mitchell v. Welcome Wagon, Inc., D.C.Tenn., 139 F.Supp. 674, affirmed 6 Cir., 232 F.2d 892; Mitchell v. Joyce Agency, Inc., 7 Cir., 211 F.2d 241, reversed on merits 348 U.S. 945, 75 S.Ct. 436, 99 L.Ed. 740; Walling v. Northwestern-Hanna Fuel Company, D.C.Minn., 67 F.Supp. 833, affirmed 8 Cir., 166 F.2d 932.

■ What must principally be so proved in an action for injunctive relief under the Act is the engagement of the employees to be affected by the injunction sought in commerce or in the production of goods for commerce,[2] as the case may be. Mitchell v. Joyce Agency, Inc., supra.

---

2. This case appears clearly not to involve that alternative which is within the provisions of the statute.

The applicability of the Act depends, not on whether the employer's business is wholly interstate, but rather on the character of the employee's activities. Walling v. Jacksonville Paper Company, 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460; McLeod v. Threlkeld, 319 U.S. 491, 63 S.Ct. 1248, 87 L.Ed. 1538; Mitchell v. Lublin, McGaughy & Associates, 358 U.S. 207, 79 S.Ct. 260, 3 L.Ed. 2d 243.

But when a defendant employer contends that, as a retail or service establishment within the definition of Title 29 U.S.C.A. § 213(a) (2), his or its business is beyond the reach of injunctive relief under the Act, even if the plaintiff secretary has proved his or its affected employees' engagement in commerce, or in the production of goods for commerce,[2] the defendant employer has the burden of proving facts which bring him or it within the protection of the exemption. Walling v. Comet Carriers, 2 Cir., 151 F. 2d 107, certiorari dismissed 328 U.S. 819, 66 S.Ct. 1007, 90 L.Ed. 1600; Durkin v. Stinson, D.C.Me., 119 F.Supp. 268; Walling v. Peacock Corporation, D.C. Wis., 58 F.Supp. 880; Mitchell v. Kentucky Finance Company, 359 U.S. 290, 79 S.Ct. 756, 3 L.Ed.2d 815.

The test of the engagement by an employer in commerce is the relationship to interstate commerce of the work which the employee performs under his employment. Thus in Walling v. Sondock, 5 Cir., 132 F.2d 77, 78, which concerned the coverage by the Act of employees of a detective agency furnishing guards or watchmen to various Houston, Texas, customers of whom some were manufacturers producing goods for commerce in buildings under the oversight of such guards or watchmen, the court, holding affirmatively as to the coverage, and in that behalf reversing the holding of the District Court, proposed this broad coverage in instances involving the production of goods for commerce:

"* * * if the work of the employes has such close and immediate connection with the process of production for commerce as to be an essential part of it, such employee is engaged in the production of goods for commerce within the meaning of the Act."

and, with rather more direct pertinence to the instant issues and facts, went immediately on to say:

"Similarly, if an employee's services are part of and contribute materially to the consummation of transactions in interstate commerce, the employee is engaged in commerce as defined by the Act."

See also Kirschbaum Company v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638; Mitchell v. Joyce Agency, Inc. (per curiam opinion) 348 U.S. 945, 75 S.Ct. 436, 99 L.Ed. 740; reversing Mitchell v. Joyce Agency, Inc., 7 Cir., 211 F.2d 241, and reinstating judgment or decree of District Court, Durkin v. Joyce Agency, 110 F.Supp. 918, which declared the Act's coverage of employees of an agency supplying guard, and detective, fire inspection and shopping services to a corporation operating stores in two states, and rejected the contention that the employer was, and the employees were, engaged in the operation of a retail or service establishment; New Mexico Public Service Company v. Engel, 10 Cir., 145 F.2d 636, holding a plant engineer operating machinery generating electricity to be engaged in commerce within the Act, where the employer was engaged in generating and marketing electricity, none of which was transmitted across a state line, but about four per cent of which was sold and delivered to customers engaged in both interstate and intrastate commerce; Holland v. Amoskeag Machine Company, D.C.N.H., 44 F.Supp. 884; McLeod v. Threlkeld, supra; Mitchell v. C. W. Vollmer & Company, 349 U.S. 427, 75 S.Ct. 860, 99 L.Ed. 1196; Mitchell v. Lublin McGaughy & Associates, supra.

The court has in view, and now recalls, without needless repetition, the facts set out in detail in the stipulation of May

2. See note 2 on page 614.

20, 1958 wherein are reflected the work performed by defendant's operators, insofar especially as it is, or may reasonably be considered to be, related to interstate commerce. Those facts are principally contained in paragraphs numbered IV, V, VI, VIII and IX. The analysis of calls contained in paragraphs V, VII and VIII is particularly instructive for its relationship to and involvement in interstate commerce.

■ It is concluded that the defendant's operators were and are engaged in commerce in consequence of the facts as found, with special reference to the factual setting mentioned in the last preceding paragraph. From that setting it is fairly disclosed that the three airlines identified employ and have employed the work of defendant's operators in the practical accomplishment of their respective air flight operations in interstate and foreign commerce, which include the carriage of persons and, to an unestablished extent, of things. Similarly, it is disclosed that the labor of defendant's operators, expended in behalf of, and for, the group of subscribers characterized as "commission merchants, manufacturers representative (sic), wholesalers and insurance firms" was of such character that it was directly effective, to a degree not measurable from the record, either in dollar volume or in terms of a percentage of defendant's overall gross income from operations, in the practical operation of interstate commerce. The court does not determine either affirmatively or negatively whether the communications of defendant's operators with or for "law firms" or "accounting firms" as such constituted an engagement in interstate commerce, and this because of a want of evidence persuasively responsive to the question. But the court does consider and conclude that defendant's operators

in the handling of overseas cables (paragraph VI of stipulation), and of calls from or to telephone exchange operators relating to overseas telephone calls (paragraph VII of stipulation) were engaged in interstate commerce.

It may be understood that, to the extent indicated in the last two preceding paragraphs, the court considers that the operators' work is "part of and contributes materially to the consummation of transactions in interstate commerce" or foreign commerce, within the thought of Walling v. Sondock, supra, and is therefore an engagement in interstate commerce. See also New Mexico Public Service Company v. Engel, 10 Cir., 145 F.2d 636, 639, 640, especially the discussion of items (1, 2) therein, and cases cited.

That the ratio [3] of work performed by operators in interstate commerce for subscribers engaged therein, as identified in the last preceding paragraph but one, to their total work, whether it be determined according to number of calls, or in terms of compensation received therefor by defendant, is small may be understood. It is recognized, too, that the stipulation limits its analysis of calls to those in August, 1957. But the court understands that month to be advanced as a representative one (see stipulation, supra). And there is no question that the operations reflected in the stipulations have been, and are, substantially regular and constant. In New Mexico Public Service Company v. Engel, supra, the operations involved were those of a corporate generator and marketer of electrical energy, none of which was transmitted across state lines, but approximately four per cent of the amount generated was sold to customers engaged in both intrastate and interstate commerce.

3. Such ratio is not adequately, but only fragmentarily shown (see paragraphs VII and VIII) and this with reference to the number of calls, rather than the defendant's cash receipts therefrom. Thus, calls relating to overseas telephone calls were fourteen in number and 0.32% of all calls answered in August, 1957, during which month also out of a total of 4,437 calls, 136 were to airlines, 136 to insurance companies, and 1,061 to commission merchants, manufacturing representatives and wholesalers. And of the last number only part and an uncertain number involved interstate or foreign commerce.

Only an uncertain and entirely unestablished fraction of that four per cent was used in interstate commerce. Yet, the manufacturer's operation was held to be engaged in interstate commerce. Upon the subject of ratio, the court there said:

"(3) An effort is made to invoke the doctrine of de minimis non curat lex on the theory that the total amount of electricity actually used in interstate commerce, when compared to the total amount generated and sold by the employer, is trivial and inconsequential and should not be considered by the court in the determination of the question whether the services performed by the employee brought him within the coverage of the Act as one 'engaged in commerce.' It is true, of course, that the percentage of electricity used in interstate commerce is small, but it is not the volume or percentage of an employee's contribution to the movement of commerce which is the test of whether he is 'engaged in commerce' within the meaning of the Act. If the services he performs are essential to the movement of commerce and not merely sporadic and isolated, he is engaged in commerce within the meaning of the Act. United States v. Darby, 312 U.S. 100, 123, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430; Walling v. Peoples Packing Co., 10 Cir., 132 F.2d 236; North Shore Corp. v. Barnett, 5 Cir., 143 F.2d 172; Sun Publishing Co. v. Walling, 6 Cir., 140 F.2d 445, 448; Schmidt v. Peoples Tele. Union, 8 Cir., 138 F.2d 13; Bracey v. Luray, 4 Cir., 138 F.2d 8, 11; Davis v. Goodman Lumber Co., 4 Cir., 133 F.2d 52; Strand v. Garden Valley Tele. Co., D.C., 51 F.Supp. 898; McKeown v. Southern Calif. Freight Forwarders, D.C., 52 F.Supp. 331, 333. Cf. National Labor Relations Board v. Fainblatt, 306 U.S. 601, 605, 59 S.Ct. 668, 83 L.Ed. 1014; Santa Cruz Co. v. Labor Board, 303 U.S. 453, 467, 58 S.Ct. 656, 82 L.Ed.

954; National Labor Relations Board v. J. G. Boswell Co., 9 Cir., 136 F.2d 585. The generation of electricity for use in the movement of interstate commerce was a part of the work-a-day duties of the employee, and his contribution in that respect was both consistent and continuous."

This court does not consider that the maxim, *de minimis non curat lex,* has application here.

■ It may be understood, therefore, that as to defendant's operators the court considers them to be, and consistently to have been, engaged in interstate commerce. A like finding, however, is not made in respect of its janitor. This is true, first, because plaintiff appears not so to have charged such engagement, or to have made a practical issue upon it, secondly, because the janitor's work and duties have not been adequately proved.

Pressed vigorously upon the court is the defendant's contention that it is entitled to exemption from the operation of the Act by virtue of the Act's own terms. Two separate subsections of the Act are alternatively considered in the briefs as the possible source of this claim. Neither of them is applicable, as the court considers.

■ The first such subsection is section 213(a) (11), whose language follows:

"The provisions of sections 206 and 207 of this title shall not apply with respect to * * *. (11) any switchboard operator employed in a public telephone exchange which has not more than seven hundred fifty stations."

Upon that subsection, two observations may be made. The first is that the defendant does not operate, and its operators are not employed in, a public telephone exchange in any fair understanding of that term. The second is that the defendant does not appear seriously, if at all, to rely on that subsection. It is clearly inapplicable here.

The second of the subsections, and the one on which defendant relies, is section 213(a) (2). Its language is:

"The provisions of sections 206 and 207 of this title shall not apply with respect to * * *. (2) any employee employed by any retail or service establishment, more than 50 per centum of which establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located. A 'retail or service establishment' shall mean an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry."

The recollection of that subsection at once compels certain conclusions. It is, first, obvious that, as distinguished from the problem of engagement in interstate commerce, what matters in determining the applicability of the quoted exempting language is not the work of the individual employee or employees, but rather the character of the "establishment" of the employer. The vital inquiry in that behalf is, therefore, whether the defendant operates a "retail or service" establishment; and if that query be answered affirmatively, then whether "more than 50 per centum of its "annual dollar volume of sales of goods or services is made within" the Commonwealth of Puerto Rico. And, of course, in answering the question whether the defendant operates a retail or service establishment, the court has to consider whether its operations are within the common significance of that term and meet the definition contained in the second and final sentence of the quoted sub-paragraph, supra.

While it may not be said that it has been proved with strict precision that 50 per centum of defendant's annual dollar volume of receipts from its enterprise is made within the Commonwealth of Puerto Rico, the court is of the opinion that enough has been shown concerning the areas of its operations that an affirmative

conclusion upon that question may and should be arrived at. The ruling shortly to be announced herein is not, therefore, bottomed upon any inadequacy or informality of proof upon that test.

Much the same may be said respecting the proof that 75 per centum of defendant's annual dollar receipts from its enterprise is not for resale. Upon that point, however, it is shown and found that whatever forms the basis of defendant's monetary receipts from its enterprise, it is not at all for resale.

But, from the evidence before it, the court is persuaded and finds, first, that it is not shown by a fair preponderance of the credible evidence that the defendant's enterprise "is recognized as retail sales or services in the particular industry," i. e., the telephone answering industry; and secondly, that, objectively regarded such enterprise is not a "retail or service establishment."

Upon the first point suggested in the last preceding paragraph, the evidence includes the stipulations and the oral testimony, supra. Of the latter, an exact reporter's transcript is returned herewith along with the files. The oral evidence was presented by four witnesses, of whom three were offered by defendant, one by plaintiff. The witnesses, their respective positions, and their essential testimony, are now very briefly summarized.

a) *Richard Bolin,* an employee "in connection with contract industrial research and market research" of Arthur D. Little Company, a subscriber of defendant, who testified that he "would classify" defendant's operations in its subscribers' behalf as a "retailing function," "on the basis that I am the ultimate consumer of the service." Thus, what he signified was his individual opinion.

b) *Carlos M. Gonzalez,* the operator and manager, and as it would appear, the founder, of defendant's business, who testified that he "would classify it as a retail business" because "the service that (he gives) to his clients ends with this client's use." Again, he signifies his own

opinion, and that of the person most vitally interested in the litigation.

c) *Clarence K. Loghry,* of White Plains, New York, an employee of New York Telephone Company commencing in 1928 (but whether now so employed is left quite vague) for fifteen years, in the commercial department of that corporation, responsible for customer orders, during which time he was active in the development of and contact with the telephone answering service enterprise, who had some acquaintance with defendant's business and operations. He testified as one in the telephone industry that telephone answering services are "considered and recognized as retail services * * * as retail businesses." The evidence of this witness was given in a notably verbose, circumlocutory, and argumentative fashion. Indeed, he was not a convincing or persuasive witness.

All of the foregoing witnesses testified for the defendant. Testifying for plaintiff was:

d) *Alexander Firfir,* a trained economist employed, at the time of his appearance in court, by Economic Development Administration, and during an earlier but not clearly prescribed interval, as an economist analyzing various problems of telephone regulations by Federal Communications Commission, thus, as a federal departmental employee, not a disinterested witness, who testified, with acknowledged reliance on the Standard Industrial Classification Manual, that the telephone answering business is classified "as a service industry, as miscellaneous businesses, Standard Industrial Classification No. 7399." He emphasized the absence from the telephone answering enterprise of "any concept of the term 'retail'" and of any connotation of the sale of commodities, and the presence of "other characteristics," which he did not identify or describe.

The foregoing necessarily narrow abbreviation admittedly does not advance all of the testimony of the witnesses named. But it is believed, with reasonable fidelity, to disclose the substance of their testimony. The court does not consider that, fairly and fully appraised in its entirety, it proves either that the telephone reporting business is, or that it is not, "recognized as retail sales or services in the particular industry." It hardly proceeds beyond the expression of the individual opinions of the several witnesses, to the limited extent to which they respectively testified, and may not be said to mirror an appraisal by the industry as such.

The court has also to recognize that by its very nature an enterprise of the type of that operated by defendant is not a retail establishment—and that is what the defendant's witnesses, including its manager and operator, seem to have tried to make of it.

Defendant cites and relies upon Kentucky Finance Company v. Mitchell, 6 Cir., 254 F.2d 8. The citation is not convincing. For, on April 20, 1959, thus after trial herein, the cited ruling was directly reversed. Mitchell v. Kentucky Finance Company, 359 U.S. 290, 79 S.Ct. 756, 757, 3 L.Ed.2d 815. In the reversing opinion, the Supreme Court, despite the recognition by the Court of Appeals of the industry's status as a retail establishment, instructively said:

"Until 1949, § 13(a) (2) exempted from the overtime and record-keeping provisions of the Fair Labor Standards Act 'Any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce.' The Administrator early ruled that personal loan companies and other business entities in what may broadly be called the 'financial industry' were not within the scope of that exemption. When Congress amended the Act in 1949 it provided that pre-1949 rulings and interpretations by the Administrator should remain in effect unless inconsistent with the statute as amended. 63 Stat. 920. The narrow issue before us, then, is whether Congress in the 1949 amendment of § 13(a) (2) broadened the scope of that section

so as to embrace personal loan companies.

"The present § 13(a) (2) differs from its predecessor primarily in the addition of a definition of the term 'retail or service establishment,' such an establishment being one '75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry; * * *' Respondents argue that they plainly come within this definition because (1) more than 75 percent of their loan and discount business is 'not for resale,' and and (2) their activities are recognized in the financial industry as being the 'retail end' of that industry. They claim that the intent of Congress in the 1949 amendment was to provide that 'local' business was exempt from the overtime requirements of the statute, and that their activities are precisely the kind the § 13 exemption was designed to embrace.

"We do not think the issue before us can be disposed of so simply. The Government points out that the concept of 'sale' is inherently inapposite to the lending of money at interest, and urges that because respondents cannot properly be said to be engaged in the 'sale of goods or services' the exemption cannot as to them come into play even if their activities are recognized as 'retail' in the financial industry. Respondents concede that they are not engaged in the sale of 'goods,' but insist that their activities do constitute a 'sale' of a 'service' within the intendment of § 13(a) (2), characterizing that 'service' as credit or the use of money.

"This is not a case where perforce we must attempt to resolve a controversy as to the true meaning of equivocal statutory language unaided by any reliable extrinsic guide to legislative intention. On the contrary, the debates and reports in Congress with reference to this section of the statute are detailed and explicit. To those legislative materials we now turn.

"The legislative history of the 1949 amendment to § 13(a) (2) demonstrates beyond doubt that Congress was acting in implementation of a specific and particularized purpose. Before 1949 the Administrator, in interpreting the term 'retail or service establishment,' then nowhere defined in the statute, had, in addition to excluding from the coverage of the exemption personal loan companies and other financial institutions, ruled that a business enterprise generally would not qualify as such an establishment unless 75 percent of its receipts were derived from the sale of goods or services 'to private persons to satisfy their personal wants,' on the theory that sales for business use were 'nonretail.' This administratively announced 'business use' test was generally approved by this Court in Roland Electrical Co. v. Walling, 326 U.S. 657 [66 S.Ct. 413, 90 L.Ed. 383].

"Congress was dissatisfied with this construction of the statute, and over the objection of the Administrator, who sought to have his 'business use' test legislatively confirmed, passed the 1949 amendment to § 13(a) (2) to do away with the rule that sales to other than individual consumers could not qualify as retail in deciding whether consumers could not qualify as retail in deciding whether a particular business enterprise was a 'retail or service establishment,' and to substitute a more flexible test, under which selling transactions would qualify as retail if they (1) did not involve 'resale,' and (2) were recognized in the particular industry as retail. We find nothing in the debates or reports which suggests that Congress intended by the amendment to broaden the fields of busi-

ness enterprise to which the exemption would apply. Rather, it was time and again made plain that the amendment was intended to change the prior law only by making it possible for business enterprises otherwise eligible under existing concepts to achieve exemption even though more than 25 percent of their sales were to other than private individuals for personal consumption, provided those sales were not for resale and were recognized in the field or industry involved as retail. Thus enterprises in the financial field, none of which had previously been considered to qualify for the exemption regardless of the class of persons with which they dealt, and regardless of whether they were thought of in the financial industry as engaged in 'retail financing,' remained unaffected by the amendment of § 13(a) (2).

"Any residual doubt on this score is dispelled by the explicit and repeated statements of the sponsors of the amendatory legislation and in the House and Senate Reports to the effect that 'The amendment does not exempt banks, insurance companies, building and loan associations, *credit companies*, newspapers, telephone companies, gas and electric utility companies, telegraph companies, etc., because there is no concept of retail selling or servicing in these industries. Where it was intended that such businesses have an exemption one was specifically provided by the law * * *.' (Emphasis added.) It is well settled that exemptions from the Fair Labor Standards Act are to be narrowly construed. A. H. Phillips, Inc. v. Walling, 324 U.S. 490, 493 [65 S.Ct. 807, 808, 89 L.Ed. 1095]; see also Powell v. United States Cartridge Co., 339 U.S. 497, 517 [70 S.Ct. 755, 766, 94 L. Ed. 1017]. In the light of the abundant pointed evidence that Congress did not intend that businesses like those of respondents be exempted from the overtime and record-keeping provisions of the statute by § 13(a) (2), we would not be justified in straining to bring respondents' activities within the literal words of the exemption."

The reversal of the Kentucky Finance Company case, which rested with manifest confidence upon Mitchell v. T. F. Taylor Fertilizer Works, Inc., 5 Cir., 233 F.2d 284; and Boisseau v. Mitchell, 5 Cir., 218 F.2d 734 serves somewhat to impair the instructiveness of the two cases last cited, and of other cases of comparable import decided by the Court of Appeals, Fifth Circuit. See also Aetna Finance Company v. Mitchell, 1 Cir., 247 F.2d 190, and Interpretative Bulletin, Part 779, Retail and Service Establishment and Related Exemptions, under Section 13(a) (2), (3), and (4) of the Fair Labor Standards Act as amended, Title 29 Chapter V, C.F.R. pages 6 to 14 inclusive. Although it was decided before the amendment in 1949 of Title 29 U.S.C.A. § 213(a) (2), Schmidt v. Peoples Telephone Union of Maryville, Mo., 8 Cir., 138 F.2d 13, 15 is not wholly uninstructive even now. Upon the legislative purpose broadly underlying from its inception the "retail or service establishment" exemption, the court in that opinion said:

"There is some suggestion that the first exemption above quoted was somewhat relied upon by the District Court in its decision. Such exemption applies to employees of 'any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce'. We do not think that Congress used the term 'service establishment' in its broad sense, which would include public utilities such as railroads, gas and electric companies, telephone and telegraph companies, and the like. In its narrower sense the term applies to an altogether different class of businesses, such as restaurants, hotels, laundries, garages, barber shops, beauty parlors, funeral homes, shoe-shining parlors, clothes pressing clubs, and the like."

In Bloemer v. Ezell, D.C.Ky., 112 F.Supp. 814, the court (Circuit Judge Martin presiding), after holding that employees of a secretarial service, consisting of receiving and transmitting telephone messages, some of which were received and transmitted in interstate commerce, were engaged in commerce under the Act, proceeded to hold further that their employer, which operated no switchboard and conducted no public telephone exchange, was neither a "service establishment" nor a "retail establishment" within the intendment of Title 29 U.S.C.A. § 213(a)(2). Granting but not deciding that a distinction may be found in its facts insofar as they lead to the earlier phase of that ruling, it would not appear that any distinction obviates its instructiveness upon the application of Section 213(a)(2). Mention is also made, and upon both aspects of this action, of the case of Tobin v. Lambert, doing business as Modern Telephone Business Service (D.C.Utah) 22 Labor Cases 6, 7. Though otherwise unreported, and evidently an orally announced ruling, it may properly be regarded in the present setting. Saying which, however, this court is fully aware that in the Lambert litigation some of the telephone calls handled originated outside, and others were made to points beyond, the state where the business was conducted.

The court, though respectfully attentive to defendant's argument and evidence in support of its claim to exemption under Title 29 U.S.C.A. § 213(a)(2), is convinced that the claim is invalid.

■■■ Briefly stated, it is now made clear that the court holds that the defendant is not relieved from coverage under the Act by the factually agreed circumstances of his payment of a quarterly license tax to the Municipality of San Juan, of the classification of its business for the purpose of such tax as the sale of services, Group A, and of the definition by local law of that group, all as set out in the stipulation filed August 12, 1958. The domestic regulatory ordinances of the Commonwealth, or its governmental subdivisions, may not, either designedly or otherwise, absolve the defendant from the obligations which the Act, Title 28 U.S.C.A. § 201 et seq. imposes upon it. The facts touching the payment of such license tax, and defendant's classification therefor, have been kept in view throughout the court's consideration of the action.

■■■ Upon the whole record, and on the basis of the facts as found, supra, the court finally concludes that plaintiff is entitled to and should be awarded injunctive relief against the defendant, substantially as prayed in his complaint. To that announcement, there is this reservation. This court will not, in the absence of an evidentiary showing persuasively requiring it—and none is presented here—expressly make such injunctive relief applicable as against the defendant's attorneys. This position is taken not because of a want of power, but rather in the exercise of judicial discretion, and because of the indelicacy, and the almost invariable lack of necessity, of their inclusion. Attorneys are, by virtue of their office, more appropriately responsive to other disciplinary sanctions which, in proper circumstances, but on refreshingly rare occasions, are within the judicial power. A judgment or decree will be made and given accordingly.

Counsel for plaintiff will forthwith prepare and submit to opposing counsel for approval as to form, or for suggestion of revision or amendment, a form of judgment or decree in accordance with this announcement, and, upon approval, shall submit it to the judge making this ruling for signature, and for entry and filing, or upon suggestion of revision or amendment, shall submit their proposed form of judgment or decree, together with such suggestion or suggestions, to the judge for settlement and signature, and, as settled and signed, for entry and filing. The judgment or decree shall be so prepared as to speak and be operative, not as of and from this date or the date of its signature by the judge, but rather as of and from the date of its filing in the clerk's office.

The clerk will forthwith transmit by United States mail one copy of this memorandum to Messrs. Montgomery and Bosch-Roque, and one copy to Mr. Schneider, attorneys in the action.